No. 36,736

ALICE PERRY SYKES, *Appellee,* v. THOMAS G. PERRY, *Appellant.*

(176 P. 2d 579)

Opinion filed January 25, 1947.

*Edward F. Arn,* of Wichita, argued the cause, and *W. E. Holmes, Howard L. Baker* and *Richard F. Mullins,* all of Wichita, were with him on the briefs for the appellant.

*Austin M. Cowan,* of Wichita argued the cause, and *W. A. Kahrs, Robert H. Nelson* and *J. Roderick Mayall,* all of Wichita, were with him on the briefs for the appellee.

The opinion of the court was delivered by

HARVEY, C. J.: This was a suit to rescind a contract pertaining to the lease and sale of real property upon the ground that defendant had failed to perform conditions thereof, and particularly those set out in paragraph 8 of the contract. (A copy of the contract is attached hereto as Appendix "A.") Defendant answered that paragraph 8 of the contract was void, and by cross bill sought a reformation of the contract to eliminate that paragraph. Fur-

ther pleadings put those matters in issue. The trial court heard the evidence and made conclusions of fact and of law and rendered judgment for plaintiff. Defendant has appealed.

The plaintiff and the defendant, Thomas C. Perry, were married in December, 1919, and were divorced in February, 1933. Sometime thereafter plaintiff married a Mr. Sykes. The defendant also remarried and at the time this action was brought his wife was Harriett Harper Perry. She died in April, 1946. Hereinafter Thomas C. Perry will be referred to as defendant. Prior to her marriage to defendant, and since, plaintiff has been a beauty parlor operator, which business over the years made a substantial profit. A year or more before her marriage to defendant she bought two of the lots described in the contract here involved, upon which a residence was situated, for $2,500, and made improvements thereon —put in hardwood floors and bathroom fixtures. At the time of their marriage defendant was a student in Kansas State College, taking a veterinary course. He completed his course and was graduated in 1921. While he was in school his wife remained in Wichita and continued her work. When defendant was graduated he returned to Wichita and began the practice of his profession as a veterinary, confining his work to small animals. A small animal hospital was built upon the two lots owned by plaintiff at a cost of about $300. Later the parties bought four lots adjoining on the north of those owned by plaintiff at a cost of $750. Later improvements were made in the house and a larger animal hospital was built at an expense of about $4,000. This became known as The Perry Small Animal Hospital. Defendant continued to operate the hospital and practice his profession until in June, 1932, when he left the state and did not return until September, 1933. During all this time plaintiff had continued her work of operating a beauty parlor, using the profits to assist in the enlargement and improvement of the hospital. While he was gone she operated the hospital with hired help for a time, and from February, 1933, to December, 1935, rented it for $150 per month. Defendant was not present when the divorce was granted plaintiff, in February, 1933, but he was represented by an attorney. In that action the plaintiff was awarded the six lots, with improvements thereon, as her separate property, she to pay the defendant the sum of $400. After defendant returned to Wichita, in September, 1933, he and plaintiff had several talks about his buying the property, which

finally culminated in the contract here in question, which was executed December 23, 1935. The contract was drawn by Mr. Hart, an attorney of Wichita, who was employed for that purpose by the defendant.

Plaintiff and defendant went to the office of the attorney together. Apparently at that time they had agreed on a price of $8,000 for the property, she having previously asked more and he having offered less. They explained to the attorney what they wanted to do. Plaintiff testified that defendant suggested what was embodied in the eighth paragraph of the contract in lieu of paying interest on the $8,000 purchase price, and stated: "I will pay you 10 percent if you don't charge me interest, as long as I live and as long as you live." The attorney explained to her that the accounting and the payments under the eighth paragraph would stop in the event of the death of defendant. She understood that. He inquired if he should die prior to having made all the $75 payments if his estate would have some equity in the property. The attorney told him there would be an equity. She was satisfied with that understanding and said she wanted to know that she would have an income. Defendant testified that the contract was written like the plaintiff wanted it and that he fully understood it. Her testimony was that she understood it. But before she executed it she took it to her attorney, Mr. Gardiner of Wichita, for independent advice. After consulting him she executed the contract. On the same date the deed from plaintiff to defendant was prepared and executed, and a copy of the contract and the deed were left with a bank where the payments were to be made.

Apparently all provisions of the contract which pertained to plaintiff and defendant were performed until about May, 1945. In the meantime and in 1940 defendant had moved the residence property from the south lots to the north lots, rebuilt and enlarged it at a cost of about $5,500, and also made some improvements in the hospital building at a cost of about $600, and had purchased some new equipment. In May, 1945, defendant consulted Mr. Holmes, an attorney of Wichita (Mr. Hart being deceased), concerning the provisions of the eighth paragraph of the contract. He testified that Mr. Holmes advised him that the eighth paragraph of the contract was void and that he need not comply with it; that he should complete making his $75 payments, get the deed from the bank and record it, and then he could convey the property or handle

it as he pleased. The balance of the $75 payments was made on June 11, 1945, and a few days later Mr. Holmes got the deed from the bank. The deed was filed for record June 26, 1945, and three days later defendant executed a deed conveying the property to his then wife, Harriett Harper Perry. Previously he had had some correspondence with Doctor Peterson, of the Tuskegee Institute, of Tuskegee, Ala., and with Doctor Evans, head of the veterinary school of the institute, about going there to teach veterinary surgery. The April, 1945, catalog of the Tuskegee College listed as a member of its faculty "Thomas G. Perry, Head of the Small Animal Medicine, Surgery, Obstetrics, and Small Animal Clinic," giving his degree as D.V.M., Kansas State College. His salary there was to be $4,000 per year. He left his wife in charge of the animal hospital in Wichita and went to Fort Collins, Colo., and took some work there preparatory to his going to Tuskegee September 1, 1945. He returned from Colorado and went to Tuskegee about that time, but had been there only about a week when his wife fell and broke her hip. This caused him to return to Wichita to care for his wife, which he did until her death in April, 1946. He testified that during this time he did not practice as a veterinary surgeon, but that his wife continued to operate the hospital.

On March 12, 1946, defendant executed a lease of the property, except the residence, for $200 per month, to Doctors Balton and McDonald, who had previously been employed by Harriett H. Perry to operate the hospital. No date was named for the termination of the lease, but it contained a provision for its termination on thirty-days' written notice of either party thereto. The lease recited that the lessor was the owner of drugs and supplies and accounts receivable in the sum of $5,500, which sum should be paid to the lessor by the lessees before they applied any profits to their own use, and stipulated that the income from the business should be applied first to (a) the payment of the rent; (b) the payment of accounts, including taxes, incurred by lessees; (c) payment of $475 per month to the lessees ($250 to one and $225 to the other); and (d) the balance of the profits to be paid to the lessor until the sum of $5,500 was fully paid, and provided a system of accounting and reports with respect to the income of the hospital and the payment. The lease specifically granted the lessees to continue the use of the name "Perry Hospital."

After finishing the $75 payments in June, 1945, defendant has

never made any accounting to plaintiff nor paid her anything from his income as a veterinary surgeon or from the income of the hospital. This is established by the pleadings as well as by the testimony.

This action was filed in the fall of 1945 (the exact date not shown), but on March 5, 1946, an amended petition was filed upon which the action was later tried. On March 11, 1946, Harriett Harper Perry executed a deed reconveying the property in question to the defendant. The parties stipulated that the deed from defendant to his wife in July, 1945, was without consideration and that the deed from Mrs. Perry to defendant in March, 1946, for the same property was without consideration.

Other facts will be discussed as they pertain to the legal questions involved.

Defendant's principal contention in the trial court and as appellant here is that the contract is divisible, that paragraph 8 is a separate and entire contract in itself and is severable from the balance of the contract, and that it is unenforceable because (a) it lacks mutuality, is uncertain and ambiguous; (b) is inequitable and unreasonable and calls for an unconscionable and hard bargain; and (c) is without consideration. The point is not well taken. The legal authors have written quite a little upon the subject of divisibility of contracts. The later general discussions may be found in 17 C. J. S. 785 to 791; 12 Am. Jur. 870, 875; Williston on Contracts, Rev. ed., sec. 860 *et seq.* Williston, *supra,* 860A defines a divisible contract as follows:

"A contract under which the whole performance is divided into two sets of partial performances, each part of each set being the agreed exchange for a corresponding part of the set of performances to be rendered by the other promisor, is called a divisible contract."

And quotes from Restatement of Contracts, § 266 (3), Comment *e,* which reads:

"A contract is divisible where by its terms, 1, performance of each party is divided into two or more parts, and 2, the number of parts due from each party is the same, and 3, the performance of each part by one party is the agreed exchange for a corresponding part by the other party."

This definition is in harmony with the general authorities above cited. Under this definition the contract in question is an entire contract and paragraph 8 is not a separable contract which is divisible from the remainder, for it contains no promise of the plaintiff.

Stated in another way, the authorities are to the effect that where there is but one promise by one party to the contract and two or more promises by the other party it is an entire indivisible contract. (See the many cases collected on this point in the American Digest System under Contracts, Key No. 171; also, see *Becker v. Mason,* 30 Kan. 697, 703, 2 Pac. 850.) Broadly speaking, in the contract here involved, as it pertains to the sale of the property, plaintiff promised but one thing—to convey the real property to defendant; while defendant promised two things—to pay $8,000 in payments of $75 per month, without interest; and thereafter to pay 10 percent of income from his work as a veterinary surgeon and from the hospital. He was obligated to do both of those things. The above stated rule, which we deem applicable here, is not the only rule used by the court in determining whether a contract is entire or divisible. The above authorities point out that it is difficult to lay down a hard and fast rule applicable to all circumstances. For example, in 12 Am. Jur. 870, it is said:

"No formula has been devised which furnishes a test for determining in all cases what contracts are severable and what are entire. The primary criterion for determining the question is the intention of the parties as determined by a fair construction of the terms and provisions of the contract itself, by the subject matter to which it has reference, and by the circumstances of the particular transaction giving rise to the question."

Our own decisions are in harmony with that view. In *Crawford v. Investment Co.,* 91 Kan. 748, 139 Pac. 481, it was held:

"The general rule is that whether or not a contract is entire or divisible is one of construction to be determined by the court according to the intention of the contracting parties as ascertained from the contract itself and upon a consideration of all the circumstances surrounding the making of it." (p.756.)

The pertinent circumstances here were that when plaintiff and defendant started the hospital she had enough money to buy a home and improve it substantially and had a paying business. He had his education, which included a degree of Doctor of Veterinary Medicine. They built a small hospital on the rear of the lots owned by plaintiff. On the combined income they bought four adjoining lots. They later improved and enlarged the small animal hospital until it covered the rear portion of three of the lots. The trial court found those improvements were made at a cost of $4,000 to $4,500. Appellant complains of the higher figure in that finding upon the ground that it was $200 more than the testimony of any witness. The abstract is not sufficiently complete for us to

check that matter, but we regard the discrepancy, if it exists, as being relatively unimportant. The hospital had been operated under the name of the Perry Hospital or Perry Small Animal Hospital for about fourteen years. Defendant had left the state in June, 1932, and did not return until September, 1933. The plaintiff had the hospital conducted while he was away and from the time of her divorce in February, 1933, she had leased the hospital for $150 per month, retaining the use of the residence. When defendant returned to Wichita in September, 1933, he leased the hospital for a year at $150 per month. The trial court found that the property covered by the contract was worth more than $8,000 at the time the contract was made. Defendant complains of that finding. He had produced two real-estate agents who had testified the property was worth about $5,000 to $5,500. But that was not the only evidence before the court. The initial cost and improvement of the property was about $7,500. The plaintiff testified that it was worth $10,000 to $12,000. She had offered it to defendant for $10,000. As a small animal hospital it had a going concern value, and for nearly two years, at least, had been rented for $150 per month. It was the function of the trial court to weigh all that evidence and we think there was ample, competent evidence to sustain its finding that at the date of the contract it was worth more than $8,000. Plaintiff had a business of her own. Defendant was a qualified veterinary surgeon and decided to continue the use of the hospital which he had been renting and the business which he had built up and followed for many years. There may have been a sentimental reason, for defendant testified that plaintiff desired that they be remarried. This was the general situation when the contract was entered into. There is nothing on the face of the contract or of the testimony of either party with respect to the circumstances of its making that indicates any view except that the parties were dealing upon a plane of good faith respecting a matter with which they were familiar, and that they had prepared a contract which they fully understood and to which they agreed. From the oral testimony it appears the principal thought in plaintiff's mind was that she should have security through the years to come, and one of the thoughts in defendant's mind was that his outlay for a time would not exceed $75 per month. In short, he did not want to pay that sum plus interest. Counsel for plaintiff has computed the present value of

the $8,000 payable without interest at $75 per month to be $5,600. We are not advised the basis of that computation and have not attempted to compute it, but obviously it was substantially less than $8,000. Plaintiff testified that defendant proposed this provision in lieu of paying the interest. Defendant does not categorically deny that, but testified the contract was written as plaintiff wanted it. The attorney who drew it volunteered information and answered questions of the parties respecting it. They both understood it. Counsel for defendant call our attention to plaintiff's testimony respecting her interview with her attorney, Mr. Gardiner. It appears they were discussing paragraph 8. The defendant was present and Mr. Gardiner said to him: "You don't want to sign a contract like this, Doctor Perry, do you?" The abstract does not show Doctor Perry's answer. The very question, however, discloses that the attorney called his attention to the provisions of paragraph 8. Plaintiff testified that she said: "He is not paying me for the hospital, but paying me what he owes me." Counsel for defendant construes this statement to mean that plaintiff was seeking pay for money she had advanced to defendant to attend school after their marriage. That was not developed by further questions and we do not care to speculate upon what the witness meant by the statement. Naturally, it was to be weighed by the trial court together with all of the other evidence.

Counsel for defendant interpret paragraph 8 of the contract as giving defendant the liberty of continuing his work as a veterinary surgeon or quitting it if he were pleased to do so. The contention is that having procured the deed under other provisions of the contract he could sell or dispose of the property in any way which suited him and quit his work as a veterinary surgeon without violating any provision of the contract. We do not so construe it. It is true that the language of the contract does not specifically say that defendant shall continue his work as a veterinary surgeon nor does it say that he is at liberty to quit his work as a veterinary surgeon. Upon that point the contract is silent. We think, however, that the only reasonable interpretation of the contract is that he would continue his work as a veterinary surgeon and continue to have the small animal hospital conducted. Otherwise the purpose of the provision would have been frustrated. The obvious interpretation of the provision is that the parties intended plaintiff should have an income, some receipts from the hospital, and from his work as a veterinary

surgeon after the deed had been delivered. Since the contract is silent on that point we think it is necessarily implied. The authorities support this view. In 6 R. C. L. 856, § 244, the rule is thus stated:

"Necessary implication is, beyond doubt, as much a part of an instrument as if that which is so implied were plainly expressed. If it can be plainly seen from all the provisions of the instrument taken together, that the obligation in question was within the contemplation of the parties when making their contract, or is necessary to carry their intention into effect—in other words, if it is a necessary implication from the provisions of the instrument—the law will imply the obligation and enforce it. The policy of the law is to supply in contracts what is presumed to have been inadvertently omitted by the parties, being supposed to have made those stipulations which as honest, fair and just men they ought to have made. Therefore, whatever may fairly be implied from the terms or nature of an instrument is, in judgment of law, contained in it. . . . In fact, it may be said that contracts impose on parties, not merely obligations expressed in them, but everything which, by law, equity, and custom, is considered incidental to the particular contract, or necessary to carry it into effect. Implied promises always exist where equity and justice require the party to do or refrain from doing the thing in question; where the covenant on one side involves some corresponding obligation on the other; where by the relations of the parties and the subject-matter of the contract a duty is owing by one not expressly bound by the contract to the other party in reference to the subject of it. Whatever the law necessarily implies in a contract is as much a part thereof as if expressly stated therein. . . . ."

Other authorities discuss the question to the same effect. See 5 Williston on Contracts, rev. ed., § 1293 *et seq.*; 12 Am. Jur. 765 to 769; 17 C. J. S. 778, and authorities cited therein. Our own cases are to the same effect. In *Zelleken v. Lynch,* 80 Kan. 746, 747, 104 Pac. 563, it was said:

"The defendants say the contract pleaded does not bind the plaintiffs to mine the property to the end of the term; that the plaintiffs are at liberty to discontinue operations and abandon the lease at any time; and that a court of equity will not compel specific performance in a case where, because of a want of mutuality in obligation, the party seeking the relief may render the decree nugatory by the exercise of a discretion which he rightfully possesses. The principle invoked is one of extensive application, but the defendants misinterpret the contract. It is well understood that whatever is necessarily implied by the words used in a contract is as much a part of the contract as if it had been expressed in elaborate terms. The covenant to mine the lots continuously can have but one rational meaning, and that is: Continuously to the end of the term. The implication is as clear and certain as if the expanding phrase had been expressly inserted. Besides this, correlative obligation sufficient to sustain specific performance may be implied from the situation of the parties and the circumstances surrounding the execution of the contract." (p. 748.)

See, also, *Austin v. Trust Co.*, 112 Kan. 545, 212 Pac. 77; *Berg v. Scully*, 120 Kan. 637, 245 Pac. 119; *Missouri Pac. Rld. Co. v. Chicago Great Western Rld. Co.*, 137 Kan. 217, 224, 19 P. 2d 484; *Francis v. Shawnee Mission Rural High School*, 161 Kan. 634, 170 P. 2d 807.

Defendant contends that even though paragraph 8 be regarded as a valid part of the contract between the parties that plaintiff had an adequate remedy at law, namely, an action for damages, which should have been pursued. The Restatement of Contracts, section 326, classifies the judicial remedies for breach of contract as, *first*, an action for damages; *second*, an action for restitution, which is frequently spoken of as a rescission of the contract; and, *third*, an action for specific performance. Other general authorities are to the same effect. Which one of these remedies is suitable depends upon the facts and circumstances. Here, in view of defendant's theory that when he procured the deed he had an absolute title to the property and could convey it to anyone; that he could quit his work as a veterinary surgeon and engage in some other business, or go to some other state; together with the fact that if the action were brought for damages there would be great difficulty in ascertaining the amount of damages, an action for damages here would have been inappropriate and unavailing. For a somewhat similar reason specific performance would not have been a suitable remedy. Indeed, it seems that restitution or rescission was the only appropriate and effective remedy open to the plaintiff. In addition to that, the injured party is the one who has the selection of the remedy which he thinks is available and appropriate. Here the plaintiff chose the remedy of rescission, that is, to have the contract set aside and to have an appropriate accounting. Her petition was drawn upon that theory. She alleged that "plaintiff is willing to do equity and is ready, able and willing to make such restitution as the court may adjudge." The prayer of her petition was that the contract and deed be set aside and plaintiff placed in possession of the property and business, and that defendant account to her for the reasonable rental value of the premises since the date of the contract, less taxes and the sum of $8,000 paid, and that she have such other and further relief as the premises warrant.

Appellant complains that the court ordered an accounting between the parties and ordered the cancellation of the warranty deed. The cancellation of the deed is the natural result of the

rescission of the contract. "Generally speaking, the effect of rescission is to extinguish the contract." (12 Am. Jur. 1038.) Certainly if the contract is set aside an accounting is proper. "The very idea of rescinding a contract implies that what has been parted with shall be restored on both sides." (12 Am. Jur. 1031.)

We wish to make it clear that the accounting has not as yet been had, hence that we have not been called upon to pass upon the items of the accounting, and do not do so. If, when the accounting is made, there is any controversy over those items or concerning the accounting as a whole the parties may present their complaints to the court.

The trial court made detailed conclusions of fact which are criticized or objected to by defendant. Some of the criticism is conceded to be of little importance and some of the objections have been heretofore referred to and not sustained. Others will be discussed. The court found that paragraph 8 was a part of the consideration for the sale of the property and that plaintiff testified she would not have executed the contract without the inclusion of paragraph 8, which she believed to be valid and enforceable. Plaintiff did testify as the court found. Defendant's objection is to the finding that it was a part of the consideration of the contract, contending that the consideration was the monthly payments. The contract designated the consideration as "the sums of money to be paid, the mutual covenants and agreements herein contained, and other good and sufficient consideration." This wording is broad enough to cover paragraph 8. The court found the rental value of the property from the date of the contract to July 1, 1945, to be $150 per month. Defendant contends there was no evidence to support that finding. It is true that when the plaintiff was asked the rental value of the property covering that period she stated she did not know. But that is not the only evidence on the subject. The evidence is clear that for almost two years prior to the date of the contract the hospital portion of the property had been leased for $150 per month. Indeed, the defendant was the lessee in one of the leases and had paid that sum for its use. There was testimony also that when defendant deeded the property to his wife in June, 1945, his wife operated the property until in March 1946, and defendant testified that it made an income to her during that time of more than $200 per month. Also there was testimony that on the 12th of March, 1946, the

defendant leased the hospital for $200 per month. We think this evidence justified the finding made, since defendant offered no evidence indicating that the rental value was less.

The trial court made a finding that at the date of the execution of the contract defendant had no intention of complying with paragraph 8, but concealed such intention from the plaintiff, who would not have signed the contract if she had known paragraph 8 would not be performed. Defendant contends there was no evidence to support this finding. There is evidence to support that part of the finding to the effect that the plaintiff thought it valid and would not have signed the contract if she had known it was not to be performed. There is a lack of evidence as to what defendant's secret intention was at the time. There is nothing in the contract itself nor in the testimony of plaintiff or of defendant tending to show that he did not at that time intend to perform it. Just when he formed that intention is not shown with certainty by the evidence. It might be said that it was before April, 1945, when he completed his arrangements to go to Tuskegee Institute to the extent that the officials of that institution included his name in the catalogue. Certainly he had formed the notion by May, 1945, when he went to see the attorney, Mr. Holmes, for he testified he went to see him about that particular phase of the contract. The court may have reached the conclusion stated by reading backward, and may have erred in doing so. We do not regard it important, however, in this case whether defendant had the secret intent not to comply with paragraph 8 at the time the contract was executed, or whether he formed it sometime in April, or May, or June, 1945. Hence, the error is not material. It seems clear that plaintiff learned nothing of such intention until about July, 1945. Defendant complains of the finding that the defendant at all times attempted to evade the duties and obligations imposed upon him by paragraph 8 of the agreement as not being supported by the evidence. It is conceded that defendant did nothing to comply with the provisions of paragraph 8, but he contends that he was under no obligation to do so. We do not agree with that contention. The trial court made conclusions of law as follows:

"I. Paragraph 8 of Exhibit 'A' is valid and enforceable and is an entire indivisible contract.

"II. By reason of defendant's repudiation of paragraph 8 and deliberate attempt to evade its provisions, the plaintiff is entitled to a cancellation of the deed and an accounting.

"III. Plaintiff is entitled to costs and an accounting."

Defendant argues that the court in its first conclusion of law determined that "Paragraph 8 . . . is an entire indivisible contract." Such a reading of the statement is not justified. Apparently there is an omission in the wording of the conclusion; that after the word "and," where last used, the words "the exhibit" or "the contract," should have been inserted. Otherwise, of course, it is contrary to the facts found by the court upon which the conclusions of law are based, to the other conclusions of law, and to the judgment rendered.

Defendant argues that paragraph 8 of the contract should be held invalid because it imposes upon him a hard and unconscionable bargain. Considering the fact that defendant had the use of the property for about nine years at monthly payments which were but little, if any, more than half of its rental value we are unable to concur in that conclusion.

Defendant points out that plaintiff in her petition did not specifically offer to pay him for the money, more than $6,000, he had paid in improving the property, or the increased value of the property by reason of such expenditures. While that item was not specifically mentioned we think the allegation in the petition "that the plaintiff is willing to do equity and is ready, able and willing to make such restitution as the court may adjudge," is sufficiently broad to authorize the court in making the accounting to take into consideration the item mentioned, or any other items which may be called to the court's attention by either party and which would be proper to be considered in determining the equities between the parties. We repeat, that the accounting has not been had, and we are not now passing upon the items thereof.

We have considered all arguments made and all authorities cited by counsel but deem it unnecessary to make a further detailed discussion of them. A few other points are discussed, which we have considered and find no error in the court's rulings thereon.

The judgment of the trial court is affirmed.

### APPENDIX "A"

#### "AGREEMENT

"This Agreement made and entered into by and between Alice Perry, herein referred to as first party, and Dr. Thomas G. Perry, herein referred to as second party, both of the city of Wichita, County of Sedgwick and State of Kansas.

"Witnesseth: That Whereas the first party is now the owner of the following described premises, to-wit:

"Lots 17, 19, 21, 23, 25 and 27 on Cleveland Avenue in Burleigh's Third Addition to the City of Wichita, Sedgwick County, Kansas, and all improvements located thereon, including the small animal hospital and all equipment belonging thereto, except the personal effects in said hospital belonging to the second party; said described premises being subject to a first mortgage to The Wichita Perpetual Building and Loan Association, on which there is a balance due of approximately Three Hundred Seventy-three and 65/100 ($373.65) Dollars, and the parties hereto are indebted to the Commercial Bank at 143 North Main Street, Wichita, Kansas, in the sum of Sixty-six ($66.00) Dollars, and

"Whereas the second party desire to rent said premises from the first party, and upon the expiration of the rental period to purchase said described premises in accordance with the terms and provisions of this agreement, and the first party is willing to rent and sell said property to the second party in accordance with the terms and provisions of this agreement,

"Now, Therefore, in consideration of the premises, the sums of money to be paid, the mutual covenants and agreements herein contained, and other good and sufficient consideration, it is agreed by and between the parties hereto as follows:

"First: The first party does hereby let and lease all of the above described premises, including the small animal hospital and all equipment and property belonging thereto to the second party, except the house which is located on a part of said premises. The second party agrees to pay to the first party the sum of One Hundred Fifty ($150.00) Dollars per month, the first payment to be made on or before January 15, 1936, and a like payment to be made on or before the 15th day of each and every month during the rental period. From the proceeds of said One Hundred Fifty ($150.00) Dollars the first party hereby agrees to pay the monthly payments due the said building and loan association amounting to $75.44 until taxes are repaid and then $50.44 until said amount due said building and loan association shall be paid in full, and the first party also agrees to pay from the proceeds of said One Hundred Fifty ($150.00) Dollars at least Ten ($10.00) Dollars each month to the Commercial Bank of Wichita until the indebtedness to said bank shall be paid in full, and when the respective sums due the said building and loan association and the said bank shall be paid in full, then the rental agreed between the parties hereto shall terminate, and the sums thereafter paid by the second party to the first party shall be applied on the purchase price of said described premises as hereinafter provided.

"Second: That first party does hereby agree to sell and convey the above described premises and all improvements and appurtenances thereunto belonging to the second party, and the second party does hereby agree to purchase said described premises on the terms and conditions herein contained. The sale price of said described premises, is Eight Thousand ($8,000.00) Dollars, and the second party agrees to pay said sum to the first party by paying the sum of Seventy-five ($75.00) Dollars per month, the first payment to be made on or before the 15th day of the month following the last pay-

ment under the aforesaid rental arrangement, and a like payment to be made, on or before the 15th day of each and every month thereafter until said sum of Eight Thousand ($8,000.00) Dollars shall have been paid in full. The second party may at any time pay any sum in addition to the said Seventy-five ($75.00) Dollars per month and receive credit therefor on the purchase price.

"Third: Second party agrees that he will after the expiration of the rental period at all times until the purchase price shall have been paid in full, keep all improvements on said premises insured in a reasonable amount and not less than $5,000.00 against loss by fire, windstorm, and tornado, said policies to be payable to both parties hereto as their interests may appear. The second party shall also pay all taxes levied and assessed against said described premises after the termination of the rental period, and all taxes now due, and all taxes that may become due during the term of the rental period shall be paid by first party.

"Fourth: If second party shall make default for a period of two months or more in the said monthly payments as herein provided, or if he shall fail to pay the taxes on said premises within two months after the same become due and payable, then and in such event it is agreed by the parties hereto that the first party may at her option terminate and end this agreement, and first party shall be entitled to keep and retain all amounts theretofore paid on said purchase price as liquidated damages and rents. In the event of the cancellation and termination of this agreement as herein provided, the first party shall be entitled to the possession of said described premises and all property, including personal property and equipment, belonging thereto.

"Fifth: The first party agrees to remove from the residence upon said described premises within thirty days after the termination of the rental period above provided for, and the second party shall thereafter be entitled to the exclusive possession of said residence, and may thereafter remove said house if he so desires. The second party shall be entitled to the exclusive possession of all of the above described premises and the small animal hospital, and all equipment and property belonging thereto under this contract of purchase, unless the same shall be canceled on account of defaults of the second party as herein provided.

"Sixth: The first party is this day executing a warranty deed describing said premises to the second party, and said deed shall be placed in escrow with the Fourth National Bank in Wichita, herein referred to as the escrow agent, together with an executed copy of this agreement, and the said escrow agent shall hold said deed and make delivery thereof in accordance with the terms and provisions of this agreement. When and if the second party shall make full payment of the purchase price of said premises as herein provided the escrow agent is hereby authorized and directed to deliver said warranty deed to second party, and he shall thereupon become the absolute owner of all of said described premises and of all improvements and appurtenances belonging thereto, and upon the full payment of the purchase price the second party shall also become the absolute owner of all equipment and appliances in or about or belonging to the said small animal hospital. If the first party shall terminate and end this contract on account of the defaults of the second party as

herein provided, the escrow agent is hereby authorized and directed to deliver said deed to the first party and the second party shall have no further interest in said premises. If the second party shall pay the full purchase price and submit to the escrow agent canceled checks payable to the first party, or to such persons as she shall direct, or receipts signed by first party or persons authorized by first party to receive such sums aggregating the said sum of eight thousand ($8,000) dollars, the escrow agent upon such evidence is authorized and directed to deliver the warranty deed to the second party.

"Seventh: The payments herein provided for shall be made by the second party to the first party or to such other person, company, or bank in the city of Wichita as the first party may in writing direct.

"Eighth: The second party agrees that he will, commencing the first month after the balance of the purchase price of said premises has been paid, pay monthly to the first party ten percent of his gross income as a veterinary surgeon, which shall include his income from said hospital, and that he will make said payments on or before the 15th day of each month, accompanied by a statement showing his gross income for the previous month, and that he will continue making said payments as long as he shall continue in the work of a veterinary surgeon.

"In Witness Whereof the parties hereto have executed this agreement in triplicate this 23rd day of December, A. D., 1935.

             "(Signed)   ALICE PERRY, *First Party*.

             "(Signed)   DR. THOMAS G. PERRY, *Second Party*."