No. 59,953

BONANZA, INC., *Plaintiff/Appellee,* v. E. A. McLEAN, *Defendant/Appellant,* v. JACK R. HUNT, CITY OF WICHITA, and SOUTHWEST NATIONAL BANK, *Third-party Defendants/Appellees.*

(747 P.2d 792)

Opinion filed December 11, 1987.

*Kurt A. Harper,* of Sherwood, Hensley & Harper, of Wichita, argued the cause and was on the briefs for the appellant.

*James D. Oliver,* of Foulston, Siefkin, Powers & Eberhardt, of Wichita, argued the cause, and *Jerry G. Elliott,* of the same firm, was with him on the brief for the appellee, Bonanza, and third-party defendant/appellee, Jack R. Hunt.

*Thomas R. Powell,* interim city attorney, argued the cause and was on the brief for appellee, City of Wichita.

*John Terry Moore,* of Moore & Rapp, P.A., of Wichita, argued the cause and was on the brief for third-party defendant/appellee, Southwest National Bank.

The opinion of the court was delivered by

PRAGER, C.J.: This is an action brought by Bonanza, Inc., the lessee under a 92-year lease of land for commercial purposes, for a declaratory judgment that the lease was in full force and effect. Bonanza also sought damages for breach of contract. The original lessor was Sweetbriar Gardens, Inc., which was later dissolved. The defendant, E.A. McLean, became the sole owner of the corporate assets and, thus, stands in the shoes of the original lessor. In response to the petition of Bonanza, defendant McLean filed 18 counterclaims and cross-claims denying the validity of the lease and adding, as third-party defendants, Jack R. Hunt, the owner of Bonanza; the City of Wichita; and the Southwest National Bank.

Following completion of discovery, the trial court granted plaintiff Bonanza summary judgment on all of McLean's counterclaims. The case then proceeded to trial by the court on plaintiff's claim of breach of contract. The trial court awarded plaintiff judgment for damages in the amount of $63,694. Defendant McLean appealed.

The facts in the case are not greatly in dispute and essentially are as follows: Defendant, E.A. McLean, was the president and sole stockholder of Sweetbriar Gardens, Inc., which owned a section of land located at 21st and Amidon in Wichita, Kansas. During 1965, there were negotiations between Sweetbriar Gardens and Bonanza for a lease on the property which ultimately led to the execution of a lease for a term of 92 years. At the time the lease was executed on September 10, 1965, the land was undeveloped except for a Sinclair service station located on a street corner. The lease granted to the lessee immediate possession of approximately 10 acres of land (roughly the northern half of the parcel) and also granted the lessee the option to lease the southern portion of the parcel. The Sinclair service station was located on the southern half of the property but was excepted from the lease as originally drafted.

The parties to the lease contemplated that a shopping center would be erected on the leased property by Bonanza, as lessee.

Thereafter, Sweetbriar Shopping Center was constructed on the property by Bonanza at a cost in excess of $2,000,000 and has been completed in its present form since the early 1970's. The property, as originally platted in 1953, was a part of the Benjamin Hills Second Addition to Sedgwick County and included residential lots and two streets running across the premises. In 1953, covenants were recorded with the Sedgwick County Register of Deeds restricting the use of the residential lots to single-family residences.

In 1965, prior to entering into the lease with Bonanza, Sweetbriar Gardens caused the land to be replatted as Sweetbriar Addition to the City of Wichita, and the new plat was approved by the Board of County Commissioners. Also in 1965, prior to entering into the lease with Bonanza, Sweetbriar Gardens caused a Community Unit Plan to be approved for the leased premises. The actions of Sweetbriar Gardens in replatting the property and in obtaining approval of the Community Unit Plan had four effects:

(1) The residential lots were deleted;

(2) the streets on which the residential lots were located were vacated;

(3) a fire lane easement was dedicated across the land formerly platted as residential lots; and

(4) approval of the Board of Zoning Appeals was obtained to use the former residential lots as a parking area.

These zoning changes having been accomplished, Bonanza proceeded to develop the land and, thereafter, in 1967, executed its option to lease the southern half of the property.

The lessor and the lessee, from the beginning, contemplated that the lessee would borrow money for the construction of commercial buildings on the property. In the original lease, the lessor agreed that it would subordinate its title to leasehold mortgages to be executed by Bonanza, as lessee. During the term of the lease, the property was subjected to nine separate mortgage contracts in which the lessor's interest was subordinated to the mortgage lien. At the time the trial court entered judgment, all of the various mortgages had been released except a $1,500,000 mortgage which was to be paid off in full within a year.

In 1968, a dispute arose between the lessor and the lessee over the amount of rent due. McLean contended that the acreage used to calculate the rent should have been determined according to the metes and bounds description used in the lease agreement which included areas dedicated to the city for streets and the service station site. For settlement purposes, a contract was signed and Bonanza agreed to pay rent on an additional .83 acre with a lump sum of $721.37 due for back rent. From that point on, Bonanza continued to pay rent of $1,500 per acre per year computed at 10.73 acres for the north parcel, 8.2866 for the south parcel, and .83 for the additional parcel.

In 1983, Bonanza determined that there was a market for mini-warehouse space and that such use might be a low traffic use that would be acceptable to neighboring owners and the city. Prior attempts to obtain rezoning for business use had been unsuccessful. Bonanza filed a petition for a change of zoning to commercial use. The area Citizens Participation Organization unanimously approved the proposal to rezone the northern strip of the premises from single family residential to office use, a classification which allowed the construction of mini-warehouses, and the rezoning was adopted by the city on January 21, 1984. Shortly thereafter, the zoning commission took action to authorize the construction of the mini-warehouse project. Notice of the above actions was given to defendant McLean in compliance with the statutes of Kansas, and she acknowledged that she personally received notice by mail. The city agency was at all times aware that Bonanza was a lessee of the property under a 92-year lease. The subject of a long-term lessee's right to apply for a zoning change was specifically discussed in hearings regarding the rezoning.

After this zoning change was obtained, the controversy arose which brought about this litigation. Bonanza undertook to obtain a construction loan secured by a leasehold mortgage. The mortgage creditor and the title insurance company required, as a condition for obtaining the loan, that a certificate be obtained from the lessor stating that the lease was in full force and effect and not in default. In response thereto, defendant McLean signed a letter stating in substance that the lease was in full force and effect. The title company found the wording of the letter

inadequate and requested that an additional certificate be obtained in order to clarify a title concern arising from the fact the copy of the recorded lease did not have the blank space for the date of the lease filled in. At this point, defendant McLean refused to sign the certificate and took the position that the lease was in default and subject to forfeiture for the reasons set forth in her counterclaims. As the result of defendant McLean's actions, plaintiff Bonanza was not in a financial position to undertake the construction of the mini-warehouses without outside financing, and therefore, could not use a portion of the northern half of the property for any business enterprises. Bonanza then brought this action for a declaratory judgment that the lease was in full force and effect and to recover damages for breach of contract and for breach of the lease agreement.

The eighteen counterclaims filed by the defendant McLean were disposed of by summary judgment in favor of the plaintiff and the third-party defendants, Hunt, the Southwest National Bank, and the City of Wichita. Following trial to the court on plaintiff's claim for breach of contract, the trial court awarded Bonanza $63,694 in damages. Defendant McLean appealed, contending that the trial court had erred in granting summary judgment against her on her counterclaims and in refusing to hold, as a matter of law, that plaintiff Bonanza had no right to recover damages from the defendant based upon a claim of breach of the contract or breach of the lease.

The first point raised by the defendant on the appeal is that the trial court erred in granting summary judgment on the defendant's counterclaim which alleged that Bonanza had forfeited its lease because it had denied defendant's title to the property. This claim of the defendant was based upon the fact that, at various times during the lease term, plaintiff executed mortgages on the property on standard forms which did not reflect that the plaintiff's interest was only a leasehold and not the fee ownership. Plaintiff also granted a water line easement to the City of Wichita and successfully applied for rezoning of the property. Defendant McLean complains, in substance, that these acts constituted a "denial of title," the remedy for which is forfeiture of the leasehold. In regard to the mortgage, the only action which Bonanza took was to execute a mortgage in 1982, similar to the

ones used on eight separate occasions in previous years which indicated that Bonanza was the owner of the property to be mortgaged. In fact, both Bonanza and defendant Southwest National Bank at all times knew and acknowledged that Bonanza held only a leasehold interest. McLean had previously subordinated her fee interest to these mortgage liens on the property. Defendant City of Wichita knew that Bonanza owned only a leasehold interest in the land at the time the City was granted an easement for a water line and rezoned the land. At all times, defendant McLean had notice of the various attempts to rezone the property and did not oppose the plans. Bonanza took no affirmative steps to hold itself out as the owner of the land. In our judgment, the trial court properly held that the acts of Bonanza did not give rise to a cause of action against Bonanza for forfeiture of the lease. It is clear that the only steps which were taken by Bonanza were for the purpose of carrying out the original intention of the parties that commercial buildings were to be constructed on the leased premises.

Defendant McLean testified in her deposition that she had no objection to commercial use of the premises. We also think it important that Bonanza paid the rent under the lease when it was due, and defendant McLean continued to accept that rent. Bonanza never refused to recognize the rights of McLean as lessor and fee owner of the property. We hold this point to be without merit.

The second issue raised by the defendant on the appeal is that the trial court erred in granting summary judgment on defendant's claim against the Southwest National Bank based upon the theory that the Bank denied McLean's title by executing and recording the 1982 mortgage on the property. Simply stated, McLean argues that the 1982 mortgage, which referred to Bonanza as "the owner" created a "cloud" on her title for which she was entitled to damages. We find this point to be without merit. The Bank never took the position that McLean had no interest in the property. The Bank officers knew at all times that Bonanza was only a long-term lessee. Under the circumstances, the trial court did not err in sustaining the motion of the defendant Southwest National Bank for summary judgment on the defendant's cross-claim.

The defendant's next point is that the trial court erred in upholding the validity of the zoning actions of the City of Wichita and the Board of Zoning Appeals in connection with the rezoning of a portion of the leased premises from (AA) Residential to (BB) Office District. In granting summary judgment on this counterclaim, the trial court found that McLean had testified by deposition that she had no objection to the commercial use of the property. In addition, the court noted that the lease agreement contemplated that the entire leased property would be available for commercial rather than for residential use. The trial court also found that, as a matter of law, the actions taken in connection with the rezoning were not subject to collateral attack because McLean failed to take a timely appeal as required by the Kansas statutes. We have concluded that the trial court did not err in granting summary judgment on the defendant's counterclaim. Clearly, Bonanza, as a lessee under a 92-year lease, was a real party in interest, and therefore, qualified to seek rezoning. Under the Kansas cases, plaintiff, as a lessee, may be considered as an owner of the premises. For example, it has been held that a lessee is an owner of property within the meaning of that term as used in our condemnation statutes. *Eisenring v. Kansas Turnpike Authority*, 183 Kan. 774, Syl. ¶ 3, 332 P.2d 539 (1958). See *City of Manhattan v. Kent*, 228 Kan. 513, 516, 618 P.2d 1180 (1980). It has also been held that the word "owner" used in the mechanics' lien statute includes the owner of a leasehold estate. *Miller v. Bankers Mortgage Co.*, 130 Kan. 543, Syl. ¶ 1, 287 Pac. 618 (1930); *Construction Materials, Inc. v. Becker*, 8 Kan. App. 2d 394, 398, 659 P.2d 243, *rev. denied* 233 Kan. 1091 (1983).

In 49 Am. Jur. 2d, Landlord and Tenant § 82, p. 123, it is stated:

"Thus, the estate of a landlord during the existence of the outstanding leasehold estate may be called the reversion, and during the existence of the lease the tenant is the absolute owner of the demised premises for all practical purposes for the term granted . . . ."

Here, plaintiff Bonanza held a 92-year lease. At the time of the rezoning, more than 70 years remained under the contract. Legally, Bonanza "owned" the leasehold interest, if not the land. It should further be emphasized that McLean did not object to the rezoning ordinance. She simply did not like the idea of mini-

warehouses and her attack on the zoning ordinance is an attempt to prevent construction. The trial court found this fact to be dispositive and did not actually determine whether the defendant was an owner or real party in interest for purposes of K.S.A. 12-708.

The trial court ruled that defendant McLean's exclusive remedy for appealing the zoning amendment was contained in K.S.A. 12-712, which provides, in substance, that any taxpayer *or any other person having an interest in property affected*, may have the reasonableness of any zoning amendment determined by bringing an action against the governing body of the City within 30 days after the making of the decision by the governing body.

The Kansas Court of Appeals has held that the remedy provided in K.S.A. 12-712 is the exclusive remedy for a person wishing to challenge either the validity or reasonableness of a zoning ordinance. *St. John v. City of Salina*, 9 Kan. App. 2d 636, Syl. ¶ 2, 684 P.2d 464, *rev. denied* 236 Kan. 876 (1984). It is clear from the deposition of defendant McLean that she received notice of the zoning change and ignored it. McLean failed to meet the 30-day statute of limitations for appeals contained in K.S.A. 12-712. McLean filed her claim against the City of Wichita on September 6, 1984. Rezoning was granted on January 24, 1984. Clearly, more than 30 days had elapsed before the suit was filed. We hold that the trial court correctly ruled that defendant McLean was barred by K.S.A. 12-712 from attacking the validity of the zoning ordinance.

The next point raised by defendant McLean is that the trial court erred in holding that the original restrictive covenants on the land were not enforceable by McLean. In 1953, McLean filed restrictive covenants on the land which was then known as the Benjamin Hills Second Addition. These covenants limited use of the land to single-family homes. McLean replatted the property in 1965 and the plat became known as the Sweetbriar Addition. She agreed to a Community Unit Plan which expressly provided there would be no residential use. The trial court found that McLean was barred from enforcing the restrictive covenants because she testified she had no objection to commercial use of the premises and agreed to a Community Unit Plan that specified commercial use of the land.

McLean entered into a lease with the specific goal of developing a shopping center, a commercial use. Now that the shopping center is complete, the character of the neighboring land is drastically different than the character contemplated by the covenants. The right to enforce restrictive covenants can be lost by acquiescence in the violation of such provisions. *Hecht v. Stephens,* 204 Kan. 559, 562, 464 P.2d 258 (1970). Because McLean has taken positive steps throughout the years to prevent residential use, she cannot now be heard to complain that her wishes have not been carried out. The ruling of the district court was correct.

The defendant McLean next contends that the district court erred in denying her possession of and/or rent for the land occupied by the service station. The record is clear that Bonanza exercised its option to rent the southern half of the parcel using a metes and bounds description which included the service station site. Following exercise of the option, the parties disagreed about the amount of land involved and whether or not plaintiff was lessee of the service station site. Their disagreement ended with a contract signed April 12, 1968. The contract of April 12, 1968, described the property to be included under the lease and clearly included the service station site. The contract specifically referred to "the Sinclair Service Station located on *said* property." This conclusion is further bolstered by the behavior of the parties. In the contract, plaintiff agreed to pay $721.37 back rent on the parcel and to pay rent in the future based on the additional acreage. McLean testified that she did include the service station site in plaintiff's lease and accepted rent which included the site for more than 15 years. We hold that the trial court properly determined this issue.

The remaining two issues raised on the appeal arose after trial to the court on Bonanza's claim of breach of contract in which it sought to recover damages. At the conclusion of the trial, the trial court made findings of fact as follows:

"1. Plaintiff Bonanza, Inc. desired to construct a mini-storage warehouse facility on a portion of the premises leased from defendant E. A. McLean located at 21st and Amidon Streets in Wichita, Kansas.

"2. By April of 1984, Bonanza had completed all steps necessary to commence

construction of the warehouse facility including obtaining the zoning changes, drawing of preliminary plans and specifications, and arranging of financing.

"3. The construction loan was to be obtained from Twin Lakes Bank in Wichita, and was to be secured by a mortgage lien on Bonanza's leasehold interest in the premises. The bank required a policy of mortgagee's title insurance in order to assure that its mortgage would be a valid lien entitled to the priority expected.

"4. As a condition to providing the requested insurance, the title company required a statement from defendant McLean as landlord to the effect that the lease was in full force and effect and not in default. Mrs. McLean signed such a statement dated April 13, 1984. This statement was prepared by Robert Hoopes, vice-president of the Twin Lakes Bank.

"5. The title insurance company was not satisfied with the form of this statement prepared by Mr. Hoopes, because it did not address the title company's requirement that a statement, referred to in the title insurance commitment as a modification of the lease, be executed to state the effective dates of the lease, which had been left blank in the copy of the lease originally filed for record with the register of deeds of Sedgwick County in 1965.

"6. An affidavit for signature by Mrs. McLean was prepared by or for the title company containing both the statement of the effective dates of the lease and the statement that it was in full force and effect. Jack Hunt, president of Bonanza, Inc., returned the first signed statement of April 13, 1984, to Mrs. McLean and requested that she sign the second statement. Mrs. McLean tore up the first statement and refused to sign the second statement or affidavit.

"7. Prior to the filing of this lawsuit, the only reason given by Mrs. McLean for refusing to sign the certificate was a claim that Bonanza was not paying enough rent, and, therefore, she contended the lease was in default. However, the amount of rent due under the lease had previously been disputed and settled by agreement dated April 12, 1968, and the same rent had been paid for over 16 years without dispute. On motion for summary judgment, it has previously been held, as a matter of law, that Mrs. McLean could not dispute the amount of rent due under the lease.

"8. Mrs. McLean testified that she first learned of Bonanza's intent to build mini-warehouses when Mr. Hunt met with her to request the second statement or affidavit referred to above. Mrs. McLean was strongly opposed to the building of the mini-warehouses. She indicated that she would do anything she could to keep them from being built. However, she testified that she would have approved the papers she was requested to sign if the project had been a drug store or other facility of which she approved. There was evidence that a branch bank, a savings and loan office, and a restaurant had previously been proposed for construction on the site in question without objection from Mrs. McLean, but necessary changes in applicable zoning ordinances for those purposes were not obtained.

"9. The evidence leaves little doubt that a primary purpose, and perhaps the only purpose, of Mrs. McLean's refusal to sign the papers necessary to acknowledge the tenant's leasehold title for purposes of obtaining an insured mortgage was to prevent construction of mini-warehouses on the leased premises.

"10. At trial, Mrs. McLean's counsel argued that she had a right to refuse to sign the requested affidavit because it purported to require a modification of the lease and because it contained erroneous statements to the effect that it was being signed on behalf of Sweetbriar Gardens, Inc., a corporation owned by Mrs. McLean that had held title to the property in 1965 when the lease was made but had later been dissolved. As stated above, these were not the reasons given by Mrs. McLean, and the court finds they were not the true reasons for Mrs. McLean's conduct. Mrs. McLean testified that there was indeed a title problem relating to her corporation, in that part of the premises had never been transferred of record from corporate ownership to her as an individual and that this was done in 1985 after the litigation commenced. To the extent such items could have been legitimate objections to signing the papers, a minimum of good faith would have resulted in a prompt and simple resolution of these items. In addition, the court finds that stating the beginning and ending dates of the lease as requested by the title insurance company, does not constitute a modification of the lease, except as to a matter of form, but rather merely states for record the existing agreement of the parties without modifying such agreement.

"11. The court finds that Mrs. McLean acted arbitrarily and unreasonably in refusing to sign the affidavit requested and in other actions and positions taken in order to preclude the construction of mini-warehouses on the leased premises. She offered no evidence herein on which any finding of good faith could be based. She did not testify to any good faith belief that she was entitled to refuse all cooperation or to preclude construction of mini-warehouses. Quite to the contrary, the evidence was that her own attorneys at that time advised her to sign the requested documents. Her testimony left no doubt that she was unalterably opposed to the construction of mini-warehouses and was beyond hearing the voice of reason.

"12. The terms of the lease between the parties do not preclude mini-warehouse use, and Mrs. McLean breached the lease in seeking to preclude construction of mini-warehouse by (i) failing to execute documents reasonably requested (ii) seeking to overturn the zoning ordinance, (iii) seeking to enforce restrictive covenants against a use permitted by the lease and (iv) declaring the lease forfeited without a good faith basis for doing so.

"13. But for the actions of Mrs. McLean, the mini-warehouse facility would have been constructed in 1984. The evidence is undisputed that, except for obtaining Mrs. McLean's signature on the documents, Twin Lakes Bank was ready to make a construction loan; all necessary plans, permits, construction contract bids had been obtained; and plaintiff was ready, willing and able to commence construction.

"14. Defendant McLean contends that Bonanza had an obligation to mitigate damages by constructing the mini-warehouse facility from its own funds, rather than from the borrowed funds that she precluded Bonanza from obtaining, and also asserts that this contention bears on causation. The facts leave no doubt that Bonanza was ready, willing and able to proceed with construction up until the time when the construction loan was unable to be completed and that the actions

of Mrs. McLean in this connection were the only reason Bonanza did not go ahead with construction.

"The facts with respect to Bonanza's ability to proceed with its own funds were that it probably had enough assets to pay the cost of construction of the facility, but this would have substantially depleted all of plaintiff's liquid assets, which plaintiff believed to be unreasonable and ill-advised. The court finds that it would be unreasonable to require plaintiff to risk its liquidity by proceeding with construction when it could not borrow against the property and that this was a less favorable alternative not reasonably practical or open to plaintiff under the circumstances."

In concluding that the plaintiff's evidence showed that the defendant had breached either the contract or the lease, the trial court held that every contract implies good faith and fair dealing between the parties to it, and a duty of cooperation on the part of both parties. Whenever the cooperation of the promisee is necessary for the performance of the promise, there is a condition implied that the cooperation will be given. The court further held that contracts impose on the parties thereto a duty to do everything necessary to carry them out. The court stated that the lease between Bonanza and McLean contemplated commercial use of the entire premises, but, prior to 1984, such use of that part of the premises where plaintiff desired to construct a mini-warehouse business was subject to zoning and community unit plan restrictions precluding commercial use. Bonanza, as lessee, sought to obtain the necessary zoning changes to permit commercial use of this portion of the premises. Such a move was contemplated by the parties. Once the change of zoning was obtained, Mrs. McLean as the landlord had no right to prohibit or interfere with any lawful use by Bonanza for commercial purposes.

The trial court concluded that, whether the breach of the lease is characterized as a breach of the covenant of good faith or of the covenant of quiet enjoyment, the court was convinced that Mrs. McLean's conduct was contrary to the obligations of the lease and constituted a breach of the lease contract for which lost profits may be recovered as damages. The court used this language in its conclusions of law:

"The Court finds that plaintiff had a contractual duty: (i) to cooperate in good faith by affirming that the lease was in full force and effect and had a definite commencement and termination date when necessary to allow the tenant to

conduct a lawful business enterprise on the leased premises so that the tenant would be enabled to fulfill the obligation to pay rent; (ii) to cooperate in obtaining zoning changes rather than bringing suit to invalidate them; (iii) to assist in removing restrictive covenants that could impair the use of the premises for purposes authorized by the lease instead of bringing suit to enforce them; and (iv) not to assert that the lease was forfeited with no good faith basis for asserting the claim, especially when a primary reason for asserting the claim was to prevent plaintiff from using and occupying the premises for a lawful business enterprise. Defendant has breached the lease contract as a matter of law in these respects, and is liable to plaintiff for the resulting damages."

We have concluded that, under the Kansas decisions, the plaintiff's evidence established a breach of contract on the part of the landlord McLean. In *Sykes v. Perry,* 162 Kan. 365, 176 P.2d 579 (1947), it was held in Syllabus ¶ 2 that the provisions not specifically mentioned in a written contract but which are essential in carrying out its purposes may be implied and, when properly implied, are as binding as if written therein. *Sykes* involved a controversy over a contract pertaining to the lease and sale of real property. *Sykes* quotes the applicable principles of law from 6 R.C.L. 856, § 244, as follows:

" 'Necessary implication is, beyond doubt, as much a part of an instrument as if that which is so implied were plainly expressed. If it can be plainly seen from all the provisions of the instrument taken together, that the obligation in question was within the contemplation of the parties when making their contract, or is necessary to carry their intention into effect—in other words, if it is a necessary implication from the provisions of the instrument—the law will imply the obligation and enforce it. The policy of the law is to supply in contracts what is presumed to have been inadvertently omitted by the parties, being supposed to have made those stipulations which as honest, fair and just men they ought to have made. Therefore, whatever may fairly be implied from the terms or nature of an instrument is, in judgment of law, contained in it. . . . In fact, it may be said that contracts impose on parties, not merely obligations expressed in them, but everything which, by law, equity, and custom, is considered incidental to the particular contract, or necessary to carry it into effect. Implied promises always exist where equity and justice require the party to do or refrain from doing the thing in question; where the covenant on one side involves some corresponding obligation on the other; where by the relations of the parties and the subject-matter of the contract a duty is owing by one not expressly bound by the contract to the other party in reference to the subject of it. Whatever the law necessarily implies in a contract is as much a part thereof as if expressly stated therein. . . .' " p. 373.

A similar holding may be found in *Heckard v. Park,* 164 Kan. 216, 188 P.2d 926 (1948). See *Wiles v. Wiles,* 202 Kan. 613,

622-23, 452 P.2d 271 (1969), where the court states that provisions not specifically mentioned in a written contract but which are essential in carrying out its purpose may be implied and when properly implied are as binding as if written therein. *Zelleken v. Lynch,* 80 Kan. 746, 104 Pac. 563 (1909).

We have concluded that the trial court correctly determined this issue and properly held that defendant McLean breached her written contract with Bonanza. The modern trend is to apply the duty of good faith and fair dealing in every contract. The duty imposes both affirmative and negative obligations. 17 Am. Jur. 2d, Contracts § 256, pp. 653-654, states:

"Every contract implies good faith and fair dealing between the parties to it, and a duty of co-operation on the part of both parties. Accordingly, whenever the co-operation of the promisee is necessary for the performance of the promise, there is a condition implied that the co-operation will be given. Indeed, it may be said that contracts impose on the parties thereto a duty to do everything necessary to carry them out. When one undertakes to accomplish a certain result he agrees by implication to do everything to accomplish the result intended by the parties. If the giving of notice is requisite to the proper execution of a contract, a promise to give such notice will be inferred. Moreover, there is an implied undertaking in every contract on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out his part of the agreement, or do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Ordinarily if one exacts a promise from another to perform an act, the law implies a counterpromise against arbitrary or unreasonable conduct on the part of the promisee. However, essential terms of a contract on which the minds of the parties have not met cannot be supplied by the implication of good faith and fair dealing."

Under the undisputed facts, it is clear that the lease contemplated commercial use and specifically the development of a shopping center on the premises. In our judgment McLean was obligated, not only to take the steps necessary to further that development, but to avoid preventing that use. Her refusal to sign a statement that the lease was still in effect and her subsequent counterclaim seeking to hold the lease null and void without any reasonable basis clearly violated McLean's obligation as lessor under the lease contract. McLean obviously interfered with Bonanza in developing the land leased for commercial development. We hold that the trial court did not err in holding that McLean had violated her contractual obligation to Bonanza.

The last point raised on the appeal is that the trial court erred in awarding damages to plaintiff for breach of the lease contract because there was no substantial competent evidence that it had lost revenue and no evidence of a causal relationship between the defendant's actions and the damages sought. At the trial, plaintiff and defendant each presented witnesses who testified as experts in the field of mini-warehouse developments. There was evidence to show that there was an extensive market for mini-warehouse storages in the area and that the project planned by the plaintiff was feasible and would have been profitable. The defendant offered expert testimony to the contrary. It would serve no useful purpose to set forth with particularity all of the evidence in the case. Suffice it to say, we have concluded that there was substantial competent evidence to uphold the findings of the trial court that the plaintiff Bonanza had been damaged in the amount of $63,694 by the delay in the construction of the mini-warehouse and the increased cost of financing the same.

Finding no error, we hold that the judgment of the district court should be and is hereby affirmed.