**MEDIA SERVICES GROUP, INC., Plaintiff,**

v.

**LESSO, INC., Great Empire Broadcasting, Inc., and Wichita Great Empire Broadcasting, Inc., Defendants.**

No. Civ.A. 97–1215–MLB.

United States District Court,
D. Kansas.

April 14, 1999.

Kathryn Gardner, Richard K. Thompson, Paul B. Swartz, Martin, Pringle, Oliver, Wallace & Swartz, L.L.P., Wichita, KS, for plaintiff.

Eric B. Metz, Triplett, Woolf & Garretson, LLC, Wichita, KS, Charles E. Millsap, Fleeson, Gooing, Coulson & Kitch, L.L.C., Wichita, KS, for defendant.

## MEMORANDUM AND ORDER

BELOT, District Judge.

This case comes before the court for consideration of a summary judgment motion filed by defendants Lesso, Inc. ("Lesso") and Great Empire Broadcasting, Inc. ("GEB").[1] The court has reviewed all documents relevant to this matter including, but not limited to, defendants' motion for summary judgment and its supporting memorandum and attachments (Docs. 34 and 35), defendants' motion to dismiss and its supporting memorandum and attachments (Docs. 10 and 11), plaintiff's response to the summary judgment motion (Doc. 45), plaintiff's response to the motion to dismiss (Doc. 16), defendants' replies (Docs. 20 and 48), this court's pretrial conference order (Doc. 78), and other related documents.

## I. NATURE OF CASE

Plaintiff Media Services Group, Inc. ("MSG") brings suit against Lesso, GEB, and WGEB, seeking to recover a broker's commission from defendants in connection with the sales of certain Kansas radio station assets. The court has subject matter jurisdiction under 28 U.S.C. §§ 1332[2] and now considers defendants' summary judgment motion.

## II. SUMMARY JUDGMENT STANDARDS

The usual and primary purpose "of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." An issue is "genuine" if sufficient evidence exists on each side "so that a rational trier of fact could resolve the issue either way" and "[a]n issue is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (citations omitted).

The moving party must initially show both an absence of a genuine issue of material fact, as well as entitlement to judgment as a matter of law. *Id.* at 670. The nature of the showing depends upon whether the movant bears the burden of proof at trial with the particular claim or defense at issue in the motion. If the nonmoving party bears the burden of proof, the movant need not "support its motion with affidavits or other similar ma-

---

1. At the time this summary judgment motion was filed, Wichita Great Empire Broadcasting, Inc. ("WGEB"), a Kansas corporation related to GEB and now a party to this lawsuit, had not been implicated in this action. As WGEB's involvement is extraneous to this motion (Doc. 35 at 6 n. 2; Doc. 45 at 3), the court will only reference GEB in this order.

The court does note that although WGEB technically is not involved in this motion, a resolution of the motion in defendants' favor obviously also benefits WGEB.

2. The parties agree that the court properly has jurisdiction over the parties and the subject matter (Doc. 78 at 2).

terials *negating* the opponent's" claims or defenses. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548 (emphasis in original). Rather, the movant can satisfy its obligation simply by pointing out the absence of evidence on an essential element of the nonmovant's claim. *Adler,* 144 F.3d at 671 (citing *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548). On the other hand, if the movant has the burden of proof on a claim or defense raised in a summary judgment motion, it must show that the undisputed facts establish every element of the claim or defense. *E.g., United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc).

Once the moving party properly supports its motion, the burden shifts to the nonmoving party, "who may not rest upon the mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Muck v. United States,* 3 F.3d 1378, 1380 (10th Cir.1993). In setting forward these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler,* 144 F.3d at 671. If the evidence offered in opposition to summary judgment is merely colorable or is not significantly probative, summary judgment may be granted. *Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 533 (10th Cir.1994). A party opposing summary judgment "cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith,* 853 F.2d 789, 793 (10th Cir.1988). Put simply, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Certain rules govern the presentation of facts and evidence. Local Rule 56.1 requires the movant to set forth a concise statement of material facts. D.Kan.Rule 56.1 (1999). Each fact must appear in a separately numbered paragraph and each

paragraph must refer with particularity to the portion of the record upon which the movant relies. *Id.* An opposing memorandum must contain a similar statement of facts. The opponent must number each fact in dispute, refer with particularity to those portions of the record upon which it relies, and if applicable, state the number of the movant's fact which is in dispute. The court may, *but is not obligated to,* search for and consider evidence in the record that would rebut the movant's evidence, but that the opponent has failed to cite. *Adler,* 144 F.3d at 672. All material facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment *unless specifically controverted* by the statement of the opposing party. *See Gullickson v. Southwest Airlines Pilots' Ass'n,* 87 F.3d 1176, 1183 (10th Cir.1996) (applying local rules of District of Utah). A standing order of this judge also precludes drawing inferences or making arguments within the statement of facts.

The parties need not present evidence "in a form that would be admissible at trial, but the content or substance of the evidence must be admissible. For example, hearsay testimony that would be inadmissible at trial may not be included...." *Thomas v. Int'l Bus. Machines,* 48 F.3d 478, 485 (10th Cir.1995) (internal quotations and citations omitted). Similarly, the court will disregard conclusory statements and statements not based on personal knowledge. *Cole v. Ruidoso Mun. Schs.,* 43 F.3d 1373, 1382 (10th Cir.1994) (regarding conclusory statements); *Gross v. Burggraf Constr. Co.,* 53 F.3d 1531, 1541 (10th Cir.1995) (requiring personal knowledge). Last, the court may disregard facts supported only by references to documents unless the parties have stipulated to the admissibility of the documents or the documents have been authenticated by and attached to an affidavit meeting the requirements of Rule 56(e). Fed.R.Civ.P. 56(e); D.Kan.Rule 56.1; 10A Charles Alan Wright, Arthur R. Miller & Mary Kay

Kane, *Federal Practice and Procedure* § 2722 (2nd ed.1983) (footnotes omitted).

In the end, when confronted with a fully briefed motion for summary judgment, the court must determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Accordingly, the court must review the "factual record and reasonable inferences therefrom in the light most favorable to the nonmoving/opposing party." *Kidd v. Taos Ski Valley, Inc.*, 88 F.3d 848, 851 (10th Cir.1996); *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2514. If sufficient evidence exists on which a trier of fact could reasonably find for the non-moving party, summary judgment is inappropriate. *Prenalta Corp. v. Colorado Interstate Gas Co.*, 944 F.2d 677, 684 (1991).

## III. *FACTS*

### A. *The Parties*

1. MSG is a Virginia corporation, with its principal place of business in Richmond, Virginia (Doc. 35 at 1; Doc. 45 at 1).

2. Lesso, GEB, and WGEB are Kansas corporations, each having its principal place of business in Wichita, Kansas (Doc. 35 at 1; Doc. 45 at 1; Doc. 62 at 1).

### B. *The Station Marketing Agreement*

3. Lesso formerly owned and operated a number of radio stations located throughout Kansas (Doc. 35 at 1; Doc. 45 at 1). Numerous tracts of Kansas real estate that Lesso owned and/or leased constituted "integral" portions of the assets used by Lesso to operate its radio stations (Doc. 35 at 1–2; Doc. 45 at 1; Steckline Aff., ¶ 2; Reed Dep. at 172).[3]

4. On April 23, 1996,[4] in Wichita, Kansas, Lesso and MSG entered into a three-page written agreement ("the Station Marketing Agreement" or "the agreement"), pursuant to which MSG was granted the right to act as an agent for Lesso to seek a buyer for Lesso's radio station assets (including its real estate assets).

5. According to the agreement, MSG would earn "a Commission" if a contract for the sale of the business was signed by Lesso and any buyer solicited by MSG. As provided in the agreement, there was only one "Commission" to be paid covering the sale of all the Lesso radio station assets and there was no breakdown between the real and personal property to be offered for sale (Doc. 35 at 2; Doc. 45 at 1–2). Similarly, nowhere in the Station Marketing Agreement did MSG break down the commission it would earn between real estate and non-real estate assets being sold (Doc. 35 at 2; Doc. 45 at 2). MSG agreed to be the broker for the sale of an ongoing business, i.e., radio stations. The Station Marketing Agreement is replete with references to the fact that MSG agreed to be the broker for the sale of "the Business." The operative language of that agreement states that Lesso "hereby employs [MSG] with the exclusive right for

---

**3.** MSG suggests that this last sentence can be controverted "to the extent that it alleges that the real estate at issue was an integral part of the assets to be sold pursuant to the Station Marketing Agreement" (Doc. 45 at 1). In support, MSG offers deposition testimony from its representative, George Reed. Reed stated that "[t]he real estate part of this deal was virtually inconsequential," meaning that "the radio station business and the valuation of stations is primarily a discounted cash-flow driven valuation model and that the actual real estate that's involved in the transaction would be a very small piece of the total pie" (Reed Dep. at 172). He concludes his state-

ment on this topic by suggesting that real estate is not a key element to calculating a station's value. The court understands Reed's comments to pertain primarily to how radio stations are valued. As such, Reed's statements do not controvert the allegation that the tracts of real estate were "integral" portions of the assets used to *operate* its radio stations. The court therefore incorporates defendants' factual allegation (Doc. 35 at 1–2, ¶ 4, second sentence) into the record.

**4.** In the second amended complaint, MSG places the date of this agreement on or about April 26, 1996 (Doc. 62).

the period of 180 days to sell the following: 'Business: See Addendum,'" a period of time that the parties, without dispute, reduced to sixty days. The agreement further requires Lesso to "cooperate with MSG in selling the Business and/or its assets ...," and states that a commission is due if certain events occur after the agreement is signed, including if "a contract for the sale of the Business at any price is signed by Seller and any buyer solicited by MSG, within one year after this agreement is terminated by either Seller or MSG." The parties also agreed in the Station Marketing Agreement to "have MSG serve as Escrow Agent...." The term "sale" was defined to "include a sale of all or part of the business to any party of the stock, partnership shares, assets, or a subsidiary of the business...." The agreement further contemplated that if the seller opted "to enter into a Local Marketing Agreement ("LMA"), Time Brokerage[,] or similar agreement instead of the sale of the Business to a prospect solicited by MSG," the seller would pay a stated percentage of commission to MSG (Doc. 45 at 5–6; Doc. 48 at 1–3).

6. The Addendum, referred to and attached to the Station Marketing Agreement, included the following:

The stations to be sold include:
Dodge City, C.P. (Construction permit)
Kxxx–AM/KQLS–FM, Colby, KS
KGNO–AM/KOLS–FM, Dodge City, KS
KYUU–AM/KSLS–FM, Liberal, KS
KWLS–AM, Pratt, KS
KZLS–FM, Great Bend, KS
KFNF–FM, Oberlin, KS
KGLS–FM, Hutchinson, KS
KILS–FM, Salina, KS
KYQQ–FM/KLLS–FM, Wichita, KS

(Doc. 45 at 6; Doc. 48 at 1–3).

7. The Station Marketing Agreement specifically provides that it could only be amended by a written document signed by the party against whom it was to be enforced. No such written amendment was ever executed. Also, the term of the Station Marketing Agreement was never extended (Doc. 35 at 2; Doc. 45 at 2).[5]

8. No sale was consummated during the Station Marketing Agreement's sixty day period.

### C. *The Lesso/GEB Transaction*

9. On October 21, 1996, Lesso entered into an Asset Purchase Agreement with GEB, whereby Lesso agreed to sell its Kansas radio assets to GEB (the "Lesso/GEB Transaction") (Doc. 35 at 3; Doc. 45 at 2). The Lesso assets covered by this agreement included all of the radio station assets which had been the subject of the Station Marketing Agreement (Doc. 35 at 3; Doc. 45 at 2).

10. The assets of the radio stations listed as "businesses" in the Station Marketing Agreement are described in detail in the Asset Purchase Agreement entered into in October 1996 by Lesso, as the seller, and GEB, as the buyer. That agreement defined "assets" as "the assets to be transferred by Seller to Buyer hereunder, as more fully specified in Section 2.2 hereof." Section 2.2 obligated Lesso to sell to GEB

all of the assets (other than the Excluded Assets, as defined in Section 2.3), real, personal and mixed, tangible and intangible (including the business of the Stations as a going concern), that are owned or held by Seller and used or useful in the conduct of the business and operations of the Stations, including Seller's rights in and to the following:

(a) all FCC Licenses and other licenses, permits and other authorizations listed in *Schedule 3.4* hereto, together with any additions thereto (including renewals or modifications of such licenses, permits and authorizations, and applications therefor) between the date hereof and the Closing Date, and

---

5. MSG admits that the sixty-day term was never extended, but reiterates that it interprets the terms of the contract to allow for compensation for acts taken after the expiration of the sixty-day period (Doc. 45 at 2 & App. 2).

all its rights in and to the call letters for the Stations;

(b) all fee interests in real property listed in *Schedule 3.5* and all buildings, structures, fixtures and improvements of every nature located thereon, together with any additions thereto between the date hereof and the Closing Date;

(c) all equipment, office furniture and fixtures, office materials and supplies, tools, inventory, spare parts and other tangible personal property listed in *Schedule 3.6*, together with any replacements thereof and additions thereto made between the date hereof and the Closing Date, and less any retirements or dispositions thereof made between the date hereof and the Closing Date which are permitted by this Agreement;

(d) except as provided in Section 2.3 hereof, all Contracts listed in *Schedule 3.8*, all Contracts in effect on the date hereof and not required to be listed on that Schedule, and all Contracts entered into or acquired by Seller between the date hereof and the Closing Date in accordance with this Agreement;

(e) all trademarks, copyrights, trade names, logos, jingles, service marks and any similar intangible assets or rights of Seller relating to the Stations; and

(f) such files, records, books of account and logs relating to and necessary or appropriate to the conduct of the business and operations of the Stations as Buyer may reasonably require, including filings with the FCC and copies of all written Contracts to be assigned hereunder.

(Doc. 45 at 6–7; Doc. 45, App. 4).

11. The Lesso/GEB Transaction was not contingent upon GEB's ability to locate a buyer for any of the radio station assets being purchased by GEB from Lesso (Doc. 35 at 3; Doc. 45 at 2).

12. On January 29, 1997, Lesso and GEB closed on the Lesso/GEB Transaction. Pursuant to that closing, Lesso sold and/or assigned to GEB its ownership and/or leasehold interests in its Kansas radio station assets. Lesso transferred to GEB title to eight tracts of real estate (situated in five counties in Kansas)[6] and assigned to GEB its leasehold interests in fourteen real estate leases (situated in ten counties in Kansas) (Doc. 35 at 3–4; Doc. 45 at 2). The court provides an explanatory table of these transfers and assignments in Appendix A of this order.

13. The Lesso/GEB Transaction did not provide for any breakdown of the purchase price between the real estate interests and personal property interests sold by Lesso to GEB (Doc. 35 at 5; Doc. 45 at 2).

14. MSG never solicited GEB to purchase the Lesso radio station assets (Doc. 35 at 5; Doc. 45 at 3).[7]

**D. *The GEB/GoodStarr Transaction***

15. On December 12, 1996, GEB entered into an agreement with GoodStarr, Inc., a Delaware corporation ("the GEB/Goodstarr Transaction"). Pursuant to this agreement, GEB agreed to sell to GoodStarr, Inc. ("GoodStarr") some of the radio station assets which GEB had contracted to purchase from Lesso under the

---

**6.** Each of the real estate interest transfers was made on January 29, 1997 (Doc. 35 at 4–5 n. 1).

**7.** MSG denies this statement. However the provided deposition testimony from Reed does not adequately controvert defendants' factual allegation (Doc. 45 at 3; Reed Dep. at 66, 69, 77, 140, 167, and 183).

Also, defendants alleged that "MSG played no role whatsoever in the negotiations which led to GEB's contract to purchase the Lesso radio station assets" (Doc. 35 at 5). Reed's statements do adequately controvert this factual allegation (Doc. 45 at 3; Reed Dep. at 66, 69, 77, 140, 167, and 183), therefore the court excludes it from the record.

Lesso/GEB Transaction (Doc. 35 at 5; Doc. 45 at 3).

16. On March 27, 1997, GEB and its assignee, WGEB, and GoodStarr and its assignee, GoodStarr Broadcasting, L.L.C., closed on the GEB/GoodStarr Transaction.[8] Pursuant to that closing, GEB sold and/or assigned to GoodStarr its ownership and/or leasehold interests in some of the Kansas radio station assets. GEB transferred to GoodStarr title to eight tracts of real estate (situated in five counties in Kansas)[9] and assigned to GoodStarr its leasehold interests in twelve real estate leases (situated in eight counties in Kansas) (Doc. 35 at 6; Doc. 45 at 3). The court provides an explanatory table of these transfers and assignments in Appendix B of this order.

17. MSG acknowledges that the GEB/GoodStarr Transaction involved the sale of real estate (Doc. 35 at 7; Doc. 45 at 3).

18. The GEB/GoodStarr Transaction did not provide for any breakdown of the purchase price between the real estate interests and personal property interests sold by GEB to GoodStarr (Doc. 35 at 7; Doc. 45 at 3).

### E. *MSG's Lack of Licensure*

19. Both the Lesso/GEB Transaction and the GEB/Goodstarr Transaction involved the sale, exchange, purchase, or lease of "Real estate"—as that term is defined in K.S.A. § 58–3036(m)—by the owner or lessee of such "Real estate" (Doc. 35 at 8–9; Doc. 45 at 3).

20. Neither MSG nor any of its partners, members, officers, or employees were licensed under the Kansas Real Estate Brokers' and Salespersons' License Act ("the Brokers' License Act" or "the

Act"), K.S.A. § 58–3034 *et seq.*, at either the time Lesso and MSG entered into the Station Marketing Agreement or at the time MSG performed any of the services which MSG claims entitles it to collect a commission from Lesso (Doc. 35 at 9; Doc. 45 at 3).

21. In working on a possible transaction involving the sale of the Lesso radio station assets, MSG was aware that the sale would involve the transfer of a number of parcels of real estate. In fact, the prospectus booklet prepared by MSG for distribution to potential buyers contained listings of various parcels of real estate to be sold (Doc. 35 at 9; Doc. 45 at 3).

22. MSG admits that as part of both the Lesso/GEB Transaction and the GEB/GoodStarr Transaction, titles to real estate were transferred (Doc. 35 at 10; Doc. 45 at 3).

23. MSG made no effort to comply with Kansas law as it relates to real estate brokers (Doc. 35 at 10; Doc. 45 at 3).

### F. *MSG's Perspective*[10]

24. According to MSG, its agreement with Lesso primarily was undertaken for the purpose of selling ongoing radio station businesses, not for the purpose of selling real estate. MSG states that the nature of the services that MSG agreed to provide, and did provide to Lesso, are set forth in the media brokerage proposal given by Reed to Lesso at or before the date on which the Station Marketing Agreement was signed. That brokerage proposal states that "[MSG] is a full service media brokerage, investment banking, valuation[,] and consulting firm, with offices throughout the United States." In that proposal, MSG described its practice as

---

8. By this time, GEB had transferred its interest in the radio station assets purchased from Lesso to WGEB. Also, GoodStarr had assigned its interests in the GEB/GoodStarr agreement to Goodstarr Broadcasting, L.L.C. (Doc. 35 at 6 n. 2; Doc. 45 at 3).

9. Each of the real estate interest transfers was made on March 27, 1997 (Doc. 35 at 6–7 n. 3).

10. MSG submitted several additional facts, which, for the most part, are uncontested by defendants (Doc. 45 at 3–7; Doc. 48 at 1–3). The court includes MSG's statements largely to help fill in the dynamics of the relationships between the parties and the context in which the present dispute arose.

a client-centered focus on media mergers and acquisition work, accompanied by complimentary services such as investment banking[ ] and valuations.... In addition, we maintain continuously updated, state-of-the-art data bases of [our] key players. Utilizing our professional expertise, customer contacts, and leading-edge software, we design and implement solutions to client problems and opportunities.

In a subsection titled "Information Needed from Lesso," the brokerage proposal listed fifteen different categories, including certain financial statements, Lesso's business plan, copies of audits, lists of personnel, [a] summary of contractual obligations, etc. Two of these categories referenced real estate (Doc. 45 at 4 & App. 3; Doc. 48 at 1–3).[11]

25. According to Reed, the real estate assets being sold in connection with either the Lesso/GEB transaction or the GEB/GoodStarr transaction were "virtually inconsequential." When asked to clarify "inconsequential," Reed responded that "the actual real estate that's involved in the transaction would be a very small piece of the total pie" (Reed Dep. at 172).

26. GEB never entered into an express oral or written agreement with MSG to pay a commission on the GEB/GoodStarr Transaction (Doc. 35 at 33; Doc. 45 at 2). However, MSG, in the form of Reed, does contend that it pursued the GoodStarr Transaction "[w]ith the full encouragement, authority[,] and cooperation of [GEB and Lesso]" (Doc. 45 at 2; Reed Dep. at 215–16).

27. MSG contends that it is entitled to recover a commission from Lesso and GEB as a result of the GEB/GoodStarr Transaction (Doc. 78 at 3–5).

28. However, MSG is unwilling or unable to state its contentions on how the consummation of the GEB/GoodStarr Transaction triggers the entitlement to a

commission payable by Lesso or GEB (Doc. 35 at 8; Doc. 45 at 3; Reed Dep. at 34–36, 95, 164).[12]

## IV. *DISCUSSION*

### A. *Statutory and Case Law Background*

In Kansas, legislation commonly referred to as the Brokers' License Act, currently codified at K.S.A. § 58–3034 *et seq.* (Supp.1998), has been in place for several decades "to protect the public from the fraud, misrepresentation, and imposition of dishonest and incompetent persons" in the context of real estate business practices. *See Thomas v. Jarvis*, 213 Kan. 671, 675, 518 P.2d 532, 535 (1974) (commenting on the early 1970s version of the code); *Woodmont Corp. v. Rockwood Ctr. Partnership*, 852 F.Supp. 948, 954 n. 11 (D.Kan.1994) ("*Woodmont I*") (extending the rationale into the 1990s). Fundamentally, the Brokers' License Act provides for the regulation of real estate brokers and sales. *Thomas*, 213 Kan. at 673, 518 P.2d at 534. Although Kansas courts have not had occasion to visit the statute often, a few cases shed light on the requirements pertinent to this case. The court discusses these cases at length below.

### 1. *Thomas v. Jarvis*

One case in particular, *Thomas v. Jarvis*, stands out as a definitive guidepost in this area of the law. In *Thomas*, defendant Jarvis owned controlling interest in three corporations: a construction company, a manufacturing company, and an electric company. *Id.* at 671, 518 P.2d 532. Jarvis entered into an agreement with plaintiffs Thomas and Caves (business brokers for "Thomas Investment"), in which plaintiffs agreed "to make an effort to sell the three companies to a qualified buyer and were to receive a commission on the sale." *Id.* The substance of the March 18, 1968 written agreement included the following: (1) Thomas Investment "was to

---

11. MSG stated that only one of the categories related to real estate, but the proposal clearly references two (Doc. 45, App. 3 at 8–9).

12. The court discusses the parties' arguments regarding this factual allegation in Appendix C of this order.

have the exclusive right to offer all or any of the three companies for sale for a period of 120 days from the date of the agreement and for two years thereafter as to contacts generated within the 120 days"; (2) Thomas Investment "was to receive a 5% commission on the first $2,000,000 plus 10% commission on any portion of the sale price over $2,000,000"; and (3) "the commission was to be paid irrespective of whether the companies were sold by a sale of the corporate assets to the purchaser or were sold by a sale of the capital stock of the companies." *Id.* at 672, 518 P.2d 532.

Shortly thereafter, Caves began contacting prospective purchasers for the three companies. One company, Butler Manufacturing Company ("Butler") informed Caves that it was not interested. *Id.* In August 1969, negotiations between Jarvis and Butler resulted in the sale of Jarvis' manufacturing and electric businesses to Butler on December 8, 1969. *Id.* Thomas Investment was not involved in the discussions between Jarvis and Butler. *Id.*

In November 1970, Thomas and Caves brought suit claiming they were owed a commission on the Jarvis/Butler sale. The case went to trial, and, at the close of plaintiffs' case, defendants moved for a "judgment of dismissal." *Id.* at 673, 518 P.2d 532. The trial court granted the motion

> for the reason that under the undisputed evidence the plaintiffs did not have a real estate brokers' license at the time the written agency agreement was entered into, that the written agency agreement provided for the sale of an interest in real estate and that under the undisputed facts the plaintiffs were barred from recovery under K.S.A. 58–3019 which provides that a real estate broker may not maintain an action for the collection of a commission for the sale of real estate without alleging and proving that he was a duly licensed real

estate broker or salesman at the time the alleged cause of action arose.

*Id.*

On appeal, the Supreme Court of Kansas addressed the following issue in *Thomas:*

> May a business broker who enters into a written agency contract to sell the assets of companies which include real property recover a commission on the sale without having a real estate brokers' license? Specifically, do the plaintiffs as business brokers fall within the statutory definition of a real estate broker so as to be subject to the provisions of the licensing act?

*Id.* In looking at the Brokers' License Act in place at the time, K.S.A. § 58–3001 *et seq.* (Supp.1972), the *Thomas* court drew the following conclusions:

> [T]he statutory language used in [section] 58–3002 is determinative of the issue in the present case. The sale of assets of the [manufacturing and electric companies] to Butler fits squarely within the category of "any transaction which does ... result in the sale ... of any real estate." Obviously the legislature intended that the Real Estate Brokers' License Act should apply to all brokers who become involved in transactions which result in the sale of real estate. This court has required a strict compliance with the terms of that act if a broker is to use the courts for the collection of fees or commissions. (*Deines v. Frevert,* 170 Kan. 278, 224 P.2d 1023 [ (1950)].) Under the undisputed facts of this case the plaintiff[s] were not licensed real estate brokers and hence it appears to us that the statute is clearly applicable.

*Id.* at 676, 518 P.2d 532.

As an alternative position, the *Thomas* plaintiffs argued that they "should be allowed to recover a commission on the sale of the personal assets of the corporations to Butler." *Id.* The Kansas Supreme Court turned down this "severability" ar-

gument. The *Thomas* court held "that the contract was an entire contract as to all the assets and not a severable one" because only one commission was to be paid covering the sale of all assets of the Jarvis companies. *Id.* at 677, 518 P.2d 532 (noting *Sykes v. Perry,* 162 Kan. 365, 176 P.2d 579 [ (1947)] ).

### 2. *Causeway Equip., Inc. v. Amaro*

Several years after the *Thomas* decision, Judge O'Connor revisited these same issues in *Causeway Equip., Inc. v. Amaro,* No. 85–2509, 1986 Dist. LEXIS 27120 (D.Kan. Apr. 7, 1986). *Causeway* arose from the breach of a broker listing agreement between plaintiff Causeway Equipment, Inc. ("Causeway Equipment") and defendant John Amaro. *Id.* at *1. According to the agreement, Causeway Equipment was to receive a 10% commission on the sale of Amaro's chiropractic practice and real estate. *Id.* Causeway Equipment arranged the sale, which included "the lot and improvements thereon and the chiropractic practice itself, including equipment, patient files[,] and good will," for the sum of $450,000.00. *Id.* Ultimately, however, Causeway Equipment sought recovery "only for ten (10) percent of the $230,-000.00 value of the remaining assets of the sale, excluding the lot and improvements." *Id.* at *4 (internal quotations omitted).

In responding to Amaro's motion to dismiss, Judge O'Connor looked for guidance from *Thomas.* After a brief review of the *Thomas* court's holding, Judge O'Connor offered the following conclusions:

> We see no basis for distinguishing the case at bar from the *Thomas* case. Although the Real Estate Brokers' and Salespersons' Act has been revised since the *Thomas* case was decided in 1974, (see 1980 Kan.Sess.Laws Ch. 164), the statutory language requiring licensure remains substantially the same. There is nothing in the revised act that reflects a legislative intent to allow a broker to recover under the facts of this case. Plaintiff's only attempt to distinguish the *Thomas* case from the facts at bar is that plaintiffs in *Thomas* made no at-tempt to separate the sale of the business from the sale of the real property until the case was heard on appeal. We do not find this distinction helpful, however, because the supreme court nevertheless considered the argument of severance and held that because there was only one commission to be paid covering the sale of both the real and personal property, there was no basis for severing plaintiffs' claims.
>
> Similarly, in this case, there is no basis for severing the contract. The broker's listing agreement provided that, in consideration of plaintiff's efforts to find "a buyer for the Chiropractic practice, Metcalf Chiropractic Offices, P.A., 7201 Metcalf, Overland Park, Kansas 66204, Chiropractic Practice and building," the buyer granted plaintiff the exclusive right to sell the same for $450,-000.00. Exhibit A, Plaintiff's First Amended Complaint. The agreement went on to provide that the plaintiff was entitled to ten percent of the sale price. Under this agreement, as in *Thomas,* there was only one commission to be paid for the entire sale. There was no breakdown of the property into real property and personal property, nor was there a separate agreement for paying the commission if only part of the practice was sold. Under these circumstances, we hold that the contract was a single contract as to all the assets and was not severable. *See Sykes v. Perry,* 162 Kan. 365, 176 P.2d 579 (1947).

*Id.* at *6–*8.

### 3. *Woodmont v. Rockwood Ctr. Partnership*

In 1994, this court decided *Woodmont I.* The facts of *Woodmont I* are fairly involved. Briefly, the case arose from an ill-fated shopping center development deal. Plaintiff Woodmont Corporation ("plaintiff") entered into a contract with defendant Rockwood Center Partnership ("Rockwood") in early 1991, in which plaintiff "agreed to develop property owned by Rockwood into a shopping center." *Wood-*

*mont I,* 852 F.Supp. at 949. Plaintiff then went to great lengths to get the project off the ground, including attempting "to obtain tenants for the proposed shopping center." *Id.* at 949–50. Although Woodmont did not have an employee with a Kansas real estate broker's license, it "solicited tenants nationwide, both through its employees and through real estate brokers, and signed numerous leases for space in the shopping center." *Id.* at 950. Ultimately, the whole project fell through, and Woodmont brought suit. *Id.*

In ruling upon Rockwood's motion for summary judgment, the court concluded that Woodmont's "contractual leasing obligations required it to have a broker's license." *Id.* at 954. However, the court did not close off Woodmont's arguments entirely, finding that Woodmont's "leasing activities were severable under the contract." *Id.* As the court emphasized, "[a] finding of severability is consistent with Kansas statute and case law." *Id.* In reaching this "severability" finding, the court noted that (1) K.S.A. § 58–3038 (of the Kansas Brokers' License Act) states "that no action can be instituted or recovery be had for compensation for any service for which a license is required unless the person seeking recovery is licensed," *not* "that an unlicensed person is completely barred from suing"; and (2) it "does not read *Thomas v. Jarvis* to indicate that where severance of contractual provisions is raised at the trial level, recovery of all contractual sums will be barred merely because the party seeking to recover did not have a required license." *Id.*

The court then explained that

[w]hether or not a contract is entire or divisible is a question of construction to be determined by the court according to the intention of the contracting parties as ascertained from the contract itself and upon the making of the contract.

*Id.* (citing *Blakesley v. Johnson,* 227 Kan. 495, 501, 608 P.2d 908 (1980)). After a close look at the contract at issue, the court reviewed its distinct qualities and made conclusions accordingly:

In this case, Woodmont agreed under the terms of the contract to do many things besides leasing.... Indeed, the contract makes it clear that Woodmont did not have to engage in leasing itself. Rather, it could obtain leasing services from third parties and defendants agreed to be responsible for the payment of certain leasing commissions paid to third party brokers. The undisputed facts are that Woodmont undertook some leasing but farmed out other leasing to third parties. Under these circumstances, the court finds that the leasing portions of the contract are severable and rejects defendants' argument that it is entitled to summary judgment on Woodmont's entire claim merely because Woodmont did not have a broker's license.

*Id.* at 955 (internal citations omitted).

### B. *Arguments and Application*

#### 1. The Brokers' License Act

In support of the general contention that the Brokers' License Act does not bar MSG's commission, MSG offers the following specific arguments: (1) legislative changes to the statute narrow its scope and leave the Brokers' License Act applicable only to "those transactions for which an exchange of real estate was the dominant and motivating purpose" (Doc. 45 at 8–10); (2) the purpose of the Brokers' License Act supports the notion that MSG should not have to face an "unjust result" (Doc. 45 at 10–13); (3) freedom of contract should be favored, and defendants should not be allowed to avoid their "obligations" because of a "technicality" (Doc. 45 at 13–14); and (4) case law from other jurisdictions supports the idea that real estate broker statutes are not intended to apply to business brokers (Doc. 45 at 15–18).

#### a. Legislative changes

MSG argues that minor 1980 revisions to the Brokers' License Act evidence intent on the part of state legislators to

restrict its application only to transactions in which "an exchange of real estate was the dominant and motivating purpose." According to MSG, this is clear because the word "any" was omitted as a modifier for the term "real estate" in the language that defined "Broker" in section 58–3035. *See* K.S.A. § 58–3035(e) (Supp.1998) (stating that " 'Broker' means an individual, other than a salesperson, who advertises or represents that such individual engages in the business of buying, selling, exchanging or leasing real estate").

The obvious implication of this argument is that the *Thomas* decision no longer merits the court's reliance because *Thomas* construed a decidedly different statute than the one before the court today. The court does not agree. As the court pointed out above, Judge O'Connor had occasion to confront this very issue in *Causeway* and determined the following: "Although the Real Estate Brokers' and Salespersons' Act has been revised since the *Thomas* case was decided in 1974, (see 1980 Kan.Sess.Laws Ch. 164), the statutory language requiring licensure remains substantially the same." *Causeway*, 1986 Dist. LEXIS 27120, at *6. The court concurs in Judge O'Connor's reasoned opinion.

Furthermore, if the Kansas legislature did intend to restrict the reach of the Brokers' License Act, the court finds it remarkable that it did not amend other, more obvious sections of the Act accordingly. For example, under section 58–3036(c) of the Brokers' License Act, titled "Licensure required," a "person" shall not:

[p]erform or offer, attempt or agree to perform any act described in subsection (e) of K.S.A. 58–3035 and amendments thereto, *whether as a part of a transaction or as an entire transaction*, unless such person is licensed pursuant to this act.

K.S.A. § 58–3036 (Supp.1998) (emphasis added). Also, subsection (e) of section 58–3035 details the behavior that constitutes "Broker" activity.[13] This statutory language suggests to the court quite a different message than that argued by MSG. In fact, unfairly or not, the plain language of the Brokers' License Act provides clear direction that the legislature intended to include practically *all* real estate transactions under the restrictions of the Act.

As further evidence of the legislature's intent, the court turns to section 58–3037 of the Brokers' License Act. Section 58–3037, titled "Exemptions," outlines the individuals, organizations, and circumstances inapplicable to the provisions of the Act. These exemptions include

(a) Any person, other than a person licensed under this act, who directly per-

---

**13.** Section 58–3035, in its entirety, exhaustively outlines virtually any activity that could be considered real estate "Broker" behavior:

"Broker" means an individual, other than a salesperson, who advertises or represents that such individual engages in the business of buying, selling, exchanging or leasing real estate or who, for compensation, engages in any of the following activities as an employee of, or on behalf of, the owner, purchaser, lessor or lessee of real estate:

(1) Sells, exchanges, purchases or leases real estate.
(2) Offers to sell, exchange, purchase or lease real estate.
(3) Negotiates or offers, attempts or agrees to negotiate the sale, exchange, purchase or leasing of real estate.
(4) Lists or offers, attempts or agrees to list real estate for sale, lease or exchange.
(5) Auctions or offers, attempts or agrees to auction real estate or assists an auctioneer by procuring bids at a real estate auction.
(6) Buys, sells, offers to buy or sell or otherwise deals in options on real estate.
(7) Assists or directs in the procuring of prospects calculated to result in the sale, exchange or lease of real estate.
(8) Assists in or directs the negotiation of any transaction calculated or intended to result in the sale, exchange or lease of real estate.
(9) Engages in the business of charging an advance listing fee.
(10) Provides lists of real estate as being available for sale or lease, other than lists provided for the sole purpose of promoting the sale or lease of real estate wherein inquiries are directed to the owner of the real estate or to real estate brokers and not to unlicensed persons who publish the list.
K.S.A. § 58–3035(e) (Supp.1998).

forms any of the acts within the scope of this act with reference to such person's own property.

(b) Any person who directly performs any of the acts within the scope of this act with reference to property that such person is authorized to transfer in any way by a power of attorney from the owner, provided that such person receives no commission or other compensation, direct or indirect, for performing any such act.

(c) Services rendered by an attorney licensed to practice in this state in performing such attorney's professional duties as an attorney.

(d) Any person acting as receiver, trustee in bankruptcy, administrator, executor or guardian, or while acting under a court order or under the authority of a will or a trust instrument or as a witness in any judicial proceeding or other proceeding conducted by the state or any governmental subdivision or agency.

(e) Any officer or employee of the federal or state government, or any political subdivision or agency thereof, when performing the official duties of the officer or employee.

(f) Any multiple listing service wholly owned by a nonprofit organization or association of brokers.

(g) Any nonprofit referral system or organization of brokers formed for the purpose of referral of prospects for the sale or listing of real estate.

(h) Railroads or other public utilities regulated by the state of Kansas, or their subsidiaries, affiliated corporations, officers or regular employees, unless performance of any of the acts described in subsection (e) of K.S.A. 58-3035 and amendments thereto is in connection with the sale, purchase, lease or other disposition of real estate or investment therein unrelated to the principal business activity of such railroad or other public utility or affiliated or subsidiary corporation thereof.

(i) The sale or lease of real estate by an employee of a corporation which owns or leases such real estate, if such employee owns not less than 5% of the stock of such corporation.

(j) The sale or lease of new homes by a person, partnership, association or domestic corporation who constructed such homes, but the provisions of this act shall apply to the sale or lease of any such homes by any employee of such person, partnership or association or by any employee of such corporation who owns less than 5% of the stock of such corporation.

(k) The lease of real estate for agricultural purposes.

K.S.A. 58–3037 (Supp.1998). Noticeably absent from the list of exemptions is any mention of "business broker" transactions or any type of transaction where the real estate portion of the deal was a minimal or "inconsequential" aspect of the entire transaction.

**b. Purpose of the Brokers' License Act**

MSG next argues that the specific purpose of the act—to protect the public from the fraud, misrepresentation, and imposition of dishonest on incompetent persons— "is not well served by extending the reach of the Act to sophisticated businessmen in transactions for the sale of ongoing businesses, rather than limiting it to transactions for the sale of residential property involving members of the general public" (Doc. 45 at 10). MSG's point is misdirected because, as explained above, the Brokers' License Act envelops *all* brokers of real estate, regardless of their apparent sophistication.[14] Also, the Act clearly in-

---

14. The court is drawn to MSG's comment that the *Thomas* result was somehow "unjust" and the legislature surely did not enact legislation that "sets a trap for the unwary" (Doc. 45 at 13). The court cannot help but note that MSG bills itself as a "full service media brokerage, investment banking, valuation and consulting firm, with offices throughout the United States" (Doc. 54, Oatman Dep., Ex. 3 at 3). The court must infer that MSG uses the services of lawyers from time to time. Whether it does or not, the Kansas laws re-

tends to include transactions in all areas of real estate, including the commercial arena.[15] If the legislature intended transactions such as the one in which MSG involved itself—a commercial deal involving, in part, the sale of real estate—to be excluded from the provisions of the Brokers' License Act, it would have expressly indicated such an exclusion. The Act holds no such language. MSG's argument should be made to the legislature.

### c. Freedom of contract and common law rights

MSG next argues that Kansas public policy compels a ruling in its favor. This argument specifically suggests that MSG would lose on "a technicality," instead of the court enforcing the intended purpose of the contract. The court disagrees. This case is not about MSG losing because of a loophole or technicality; it is about whether Kansas law required MSG to have a broker's license to carry out its end of the bargain. It did. The result may seem harsh to MSG, but, as discussed previously, the Brokers' License Act is clear about the requirements pertinent to the brokering of real estate.

MSG also argues that the Act is penal in nature and operates in derogation of its common law rights, presumably, to conduct business and to have access to the courts. This argument is without merit. The Act, like many others, simply regulates the way real estate transactions must be conducted in this state. It does not prohibit them. Similarly, the Act does not bar access to the courts. It merely restricts access to those who comply with its provisions. In practical effect, the Act is no different than those which require licensure of lawyers or doctors or statutes

of limitations which preclude maintenance of stale lawsuits.

### d. Case law from other jurisdictions

Last, MSG argues that "[c]ases from other jurisdictions have recognized that similar real estate broker statutes were not intended to apply to business brokers" (Doc. 45 at 15). In making this point, MSG does not attempt to compare the Kansas Brokers' License Act with its sister code from any of the other jurisdictions. Rather, it merely provides the court with random commentary from various state courts of appeal. Although these cases certainly present valid expressions of the law in their respective states, the court does not find any of the cases provide by MSG to be persuasive.

Again, as stated above, the court finds the applicable code and interpretive case law in this jurisdiction to be clear on the issues in the present case. Thus, even if the cases from other jurisdictions analyzed code language identical to that found in the Brokers' License Act and provided holdings in direct conflict with *Thomas, Causeway,* and *Woodmont I,* the court would not go against the grain of current Kansas law, no matter how unfair MSG believes it to be. MSG's argument fails.

### e. Conclusion

For the reasons explained above, the court concludes that MSG was required to have a broker's license under the provisions of the Kansas Brokers' License Act in order to collect a broker's commission from defendants in connection with the sale of the radio station assets in question. Furthermore, the court finds that MSG (and its employees) lacked such a license,

---

garding real estate brokers, and the decisions pertaining thereto, are not hard to find, nor do they constitute a "trap for the unwary." If MSG or its lawyers had consulted Kansas law prior to entering into the Station Marketing Agreement, it would have been easy to structure the transaction to comply with the applicable law. Contrary to MSG's arguments, there is nothing unfair about requiring a self-described sophisticated company to be aware of, and comply with, the law.

**15.** By definition, " '[r]eal estate' means *any* interest or estate in land, including *any* leasehold or condominium, whether corporeal, incorporeal, freehold or non-freehold and whether the real estate is situated in this state or elsewhere...." K.S.A. § 58–3035(k) (Supp.1998) (emphasis added). Section (k) also spells out exclusions from the "real estate" definition, but makes no distinction between commercial and personal real estate.

thereby foreclosing it from any claimed commission.

## 2. Severability

■ Alternatively, MSG argues that even if the Brokers' License Act does apply, severance is permissible. In support of this argument, MSG suggests that (1) severance is consistent with the Kansas Brokers' Act (Doc. 45 at 18–19); (2) severance is consistent with Kansas case law (Doc. 19–20); (3) severance is appropriate for the circumstances of the present matter (Doc. 45 at 20–21); and (4) severance is permitted for business brokers in other jurisdictions under similar facts (Doc. 45 at 21–22).

Although the court agrees that severance may be consistent with the Kansas Brokers' Act and Kansas case law in certain cases, the facts of the present case do not lend themselves to the conclusion MSG desires. *Thomas, Causeway,* and *Woodmont I* provide clear guidance on this issue. Collectively, they stand for the proposition that severance is not appropriate when the contract reflects a straightforward one sale/one commission arrangement that includes, at least partially, activity covered under the Brokers' License Act. In other words, severance cannot occur if the agreement is for one commission that is based on a business being sold as single entity or single bundle of assets, where no distinction is made between the real property and the other assets. For instance, in *Thomas,* "[t]here was only one commission to be paid covering the sale of all assets of the [companies]." 213 Kan. at 677, 518 P.2d 532. Similarly, in *Causeway,* "[t]here was only one commission to be

paid for the entire sale" and "[t]here was no breakdown of the property into real property and personal property, nor was there a separate agreement for paying the commission if only part of the practice was sold." 1986 U.S.Dist. LEXIS 27120, at *7–*8. Both cases held that severance was not appropriate. On the other hand, in *Woodmont I,* "the contract [made] it clear that Woodmont did not have to engage in leasing itself" and "it could obtain leasing services from third parties and defendants agreed to be responsible for the payment of certain leasing commissions paid to third party brokers." 852 F.Supp. at 955. Under those circumstances, the leasing portions of the contract in *Woodmont I* were severable.

After careful review of the facts of the present case and a comparison to *Thomas, Causeway,* and *Woodmont I,* the court finds that it has no basis for severing MSG's contract. The Station Marketing Agreement plainly indicates that only one commission was to be paid covering the sale of all the Lesso radio station assets. Also, the agreement did not differentiate between the real and personal property to be offered for sale. No other agreement exists from which MSG could claim a commission. For these reasons, MSG's severance argument must fail.

## V. CONCLUSION

For the aforementioned reasons, the court GRANTS defendants' motion for summary judgment (Doc. 34). The matter is hereby dismissed with prejudice and all relief denied.[16]

16. Five dispositive motions were ripe for decision in this case as of July 9, 1998:(1) GEB's motion to dismiss Count II of MSG's complaint, filed June 13, 1997 (Docs. 10 and 11); (2) the motion addressed in this order, Lesso's and GEB's motion for summary judgment on the licensing issue, filed December 29, 1997 (Docs. 34 and 35); (3) MSG's summary judgment motion, filed March 26, 1998 (Docs.52–54); (4) defendants' supplemental summary judgment motion, filed April 20, 1998 (Docs. 63 and 64); and (5) GEB's and WGEB's motion to dismiss, filed April 28, 1998 (Docs.66–

67). In a February 9, 1999, status conference, the parties recommended that the court first decided Lesso's and GEB's initial summary judgment motion (Doc. 34), followed by the initial motion to dismiss (Doc. 10). The court, after reaching the above decision and after carefully reviewing the other pending motions and respective memoranda, concludes that (1) the resolution of the licensing issue resolves this matter entirely; and (2) the other four motions are rendered moot. The court's order therefore disposes of the matter in regard to *all* defendants, including WGEB.

The court neither invites nor encourages a motion for reconsideration. Any motion for reconsideration must comply with Fed. R.Civ.P. 59 and 60, D.Kan.Rule 7.3, and the standards set out in *Comeau v. Rupp*, 810 F.Supp. 1172, 1174 (D.Kan.1992). The motion may not exceed three double-spaced pages in length, including supporting arguments and authorities, regardless of the number of points raised. A response shall also be limited to three pages. No replies may be filed. Motions for extension of these time periods will be viewed with disfavor. The filing of such a motion does not relieve the party of its obligation to meet the relevant deadline, even if the motion is not ruled upon prior to the expiration of the deadline.

IT IS SO ORDERED.

### Appendix A: Summary of Transfers and Assignments Involved in the Lesso/GEB Transaction
#### Parcels of Real Estate Deeded to GEB in Lesso/GEB Transaction

| Deed No. | County | No. of Tracts/Parcels Involved |
|---|---|---|
| 1 | Barton | 1 |
| 2 | Seward | 2 |
| 3 | Pratt | 1 |
| 4 | Thomas | 3 |
| 5 | Reno | 1 |

#### Real Estate Leases Assigned to GEB in Lesso/GEB Transaction

| Lease No. | County | Landlord |
|---|---|---|
| 1 | Ottawa | Chaney |
| 2 | Barton | Smoky Hills Public Television |
| 3 | Ford | Sunflower Telephone Co. |
| 4 | Thomas | Union Pacific Railroad Co. |
| 5 | Sedgwick | Caster Excavating, Inc. |
| 6 | Gray | KBS Limited Partnership |
| 7 | Thomas | Mustoe |
| 8 | Cowley | Sheldon Kamen |
| 9 | Reno | Hinshaw |
| 10 | Gray | Dewey |
| 11 | Ford | Leonard |
| 12 | Saline | Steele |
| 13 | Decatur | Frickey |
| 14 | Gray | Ellner |

### Appendix B: Summary of Transfers and Assignments Involved in the GEB/GoodStarr Transaction
#### Parcels of Real Estate Deeded to GoodStarr in GEB/GoodStarr Transaction

| Deed No. | County | No. of Tracts/Parcels Involved |
|---|---|---|
| 1 | Barton | 1 |
| 2 | Pratt | 1 |
| 3 | Reno | 1 |
| 4 | Seward | 2 |
| 5 | Thomas | 3 |

#### Real Estate Leases Assigned to GoodStarr in Lesso/GEB Transaction

| Lease No. | County | Landlord |
|---|---|---|
| 1 | Thomas | Mustoe |

| 2 | Saline | Steele |
| 3 | Gray | Ellner |
| 4 | Gray | Dewey |
| 5 | Reno | Hinshaw |
| 6 | Thomas | Union Pacific Railroad Co. |
| 7 | Barton | Smoky Hills Public Television |
| 8 | Ford | Sunflower Telephone Co. |
| 9 | Gray | KBS Limited Partnership |
| 10 | Ottawa | Chaney |
| 11 | Ford | Leonard |
| 12 | Decatur | Frickey |

### Appendix C: Contested Allegation Regarding MSG's Unwillingness or Inability to State its Contentions

MSG argues that the factual allegation "MSG is unwilling or unable to state its contentions on how the consummation of the GEB/GoodStarr Transaction triggers the entitlement to a commission payable by Lesso or GEB" should not be considered part of the factual record for the present summary judgment motion for the following reason: "Legal contentions are not the proper subject of fact finding depositions, and are properly included in the pleadings of record in this case" (Doc. 45 at 3). In response, defendants suggest that the allegation is properly included because (1) MSG was served a notice of deposition pursuant to Fed.R.Civ.P. 30(b)(6); (2) MSG designated Reed to speak on behalf of the corporation; (3) Reed admitted that he had not even generally reviewed the notice and list of areas of inquiry prior to the deposition; (4) under Rule 30(b)(6) and supporting case law, MSG was required to prepare Reed to give complete, knowledgeable, and binding answers, and Reed was required to speak for MSG and present its positions; and (5) the allegation offered reflects Reed's responses (Doc. 35 at 8 n. 4).

Under Rule 30(b)(6), MSG had the option to select a representative who, at deposition, could respond to matters set forth in defendants' notice. *E.g., Federated Mut. Ins. Co. v. Botkin Grain Co.,* No. 91–1223–MLB, 1997 WL 158399, at *3 (D.Kan. Mar. 27, 1997). MSG chose Reed. MSG then was obligated to prepare Reed to provide complete, knowledgeable, and binding answers. *Id.* (citing *Nevada Power Co. v. Monsanto Co.,* 891 F.Supp. 1406, 1418 (D.Nev.1995) and *United States v. Massachusetts Indus. Fin. Agency,* 162 F.R.D. 410, 411 (D.Mass.1995)).

By rule, the designee, Reed, is supposed to "testify as to matters known or reasonably available to the organization." Fed. R.Civ.P. 30(b)(6). This means that Reed's testimony, offered as the representative voice of the corporation, "is not simply . . . about matters within [the designee's] own personal knowledge," but goes to "matters to which the corporation has reasonable access." *Rainey v. American Forest and Paper Ass'n, Inc.,* 26 F.Supp.2d 82, 94 (D.D.C.1998) (noting *United States v. Taylor,* 166 F.R.D. 356, 361 (M.D.N.C.1996), *aff'd, United States v. Taylor,* 166 F.R.D. 367 (M.D.N.C.1996)). Such testimony on behalf of a corporation necessarily implicates "subjective beliefs and opinions," *Taylor,* 166 F.R.D. at 361 (citing *Lapenna v. Upjohn Co.,* 110 F.R.D. 15, 20 (E.D.Pa. 1986), including the corporation's "interpretation of documents and events." *Id.* (citing *Ierardi v. Lorillard, Inc.,* No. 90–7049, 1991 WL 158911 (E.D.Pa. Aug. 13, 1991)). As the *Taylor* court states: "The designee, in essence, represents the corporation just as an individual represents him or herself at a deposition." *Id.*

This court previously has held that the binding effect of the testimony of a Rule 30(b)(6) deponent "is merely as an evidentiary admission." *Botkin Grain,* 1997 WL 158399, at *4. As such, it "may be controverted or explained by a party, as contrasted with a judicial admission, i.e., a formal concession in a pleading or stipulation which is conclusive and cannot be withdrawn without leave of court." *Id.* (citing *Keller v. United States,* 58 F.3d 1194, 1198 n. 8 (7th Cir.1995)). In the present case, MSG, when given the opportunity to controvert defendants' factual allegation based on testimony (or lack thereof) from Reed, simply brushed off defendants' statement as "legal contentions" and inappropriate subject matter for "fact finding depositions." The court disagrees with MSG. MSG presented Reed to answer for itself. Reed came to the deposition under the obligation to give complete, knowledgeable, and binding answers. These answers were to include MSG's subjective beliefs and opinions on the events entitling it to a commission. Reed, upon examination, provided the following testimony:

Q. (By Mr. Millsap) My question was am I correct, sir, that there are three events described in that paragraph that starts a contract for the sale which describe events upon which [MSG] would earn a commission under this agreement?

A. I'm not sure what you mean by event, but it does specify what triggers the payment of a fee if that what you're asking me.

Q. Can you tell me, sir, in this case which, if any, sections of that paragraph your company relies upon in claiming that a commission has been triggered and now owed by [Lesso]?

A. I think you're asking me to address a legal question and I'm not sure I'm qualified to address that.

Q. I'm asking you for your company's contentions regarding this contract and whether any of those triggering events there have created a fee for your company.

Mr. Swartz: I think he has given you the correct answer to your question without any prompting.

Mr. Millsap: I think I'm entitled to ask contention type questions, particularly in a 30(b)(6) depo. You know, if the plaintiff corporation is contending that a fee has been triggered under any of those three events, I think I'm entitled to know which it is.

Mr. Swartz: I'll let him answer with the understanding that that may not be the total contention legally that his lawyers put forth. So what I'm saying is don't feel bound by what he says because we may advise him that he has some rights under those other sections of this.

Q. (By Mr. Millsap) Well, anyway, do you understand what the question is, sir?

A. Could you repeat it?

Q. Let's try it this way. You're acquainted with this paragraph that has the triggering events for a commission, are you not?

A. Yes.

Q. For example, there's one which would call for a commission if you come up with a qualified buyer willing to pay the price agreed in writing and for some reason a seller won't follow through, that's one of the triggering events?

A. Correct.

Q. Can you tell me, sir, what your company contends on the issue of which, if any, of these triggering events has occurred and now causes Lesso to owe your company a commission?

A. You're asking me a legal question and I can't answer a legal question. I know that through our efforts the radio stations in question were sold to a buyer that we solicited during the term of the agreement. I don't know if that answers your question or not.

. . . .

Q. As you sit here today, Mr. Reed, who is it that you believe owes MSG a

fee in connection with the GoodStarr transaction?

A. I think that's a legal point that I can't answer.

Q. You believe that someone does?

A. Clearly we performed the services that we were asked to perform, yes.

. . . .

Q. Is it correct that your company is basing its claim of entitlement to a commission upon the sale of those radio stations to GoodStarr?

A. We've reviewed a number of contracts and agreements and other various and sundry documents and it appears to us that a fee is due us from the seller. Whether the seller is Lesso or Larry Steckline or [GEB], I'm not certain of that at this juncture.

(Reed Dep. at 35–37, 95, 164).

Based on these binding answers, it is perfectly appropriate for defendants to allege that "MSG is unwilling or unable to state its contentions on how the consummation of the GEB/GoodStarr Transaction triggers the entitlement to a commission payable by Lesso or GEB." Without any supported facts from MSG to controvert this statement, the court accordingly includes defendants allegation in the summary judgment record.